WILSON, J.,
for the Court:
■¶ 1. Becky Hall appeals from a judgment terminating her parental rights to two of her children. The children were placed in the custody of the Jackson County Department of Human Services (DHS) when they were only six weeks old and twenty-two months old after Hall was arrested on drug charges. At the time, Hall was living in an apartment with the two children and her boyfriend, Clyde Brown, who is the father of the younger child. Brown had been cooking methamphetamine (meth) in the apartment—so much meth, in fact, that it contaminated the apartment and three surrounding units. Hall subsequently entered into a pretrial diversion program. She completed a drug treatment program, has refrained from using drugs, and has maintained a stable residence and a steady job. But she also continued to live with and maintain a relationship with Brown, who continued to use drugs and engage in criminal activity. Hall did so despite warnings from DHS and others that her cohabitation and relationship with Brown would prevent her from regaining custody of her children. In the meantime, the two small children bonded with foster families that love them and want to adopt them. After hearing testimony from numerous witnesses, the Jackson County Youth Court found that termination of Hall’s parental rights was in the children’s best interests and that grounds for termination had been proven by clear and convincing evidence. Finding no reversible error, we affirm.
FACTS AND PROCEDURAL HISTORY
I. Children Taken Into DHS Custody
¶ 2. In August 2009, Becky Hall was living in an apartment in Gautier with her boyfriend Clyde Brown and her three minor children, Kate Brown (K.M.B.), Ben Howard (B.A.H.), and Hank Hall. Kate was less than six weeks old at the time. Brown is her father.[2] Ben was twenty-two months old. His father, Billy Howard, was then incarcerated for possession of drugs *1225 and stolen property. Hank was six years old. Hank’s father, Eric Davis, was also a convicted felon, and a third party had been named Hank’s legal guardian.
¶ 3. Hall’s apartment was fully subsidized by U.S. Department of Housing and Urban Development (i.e., free to Hall) and thus was subject to certain restrictions. For example, unapproved residents and convicted felons were not allowed to live in the apartment, and there was a zero-tolerance policy regarding drugs. Hall was in violation of these rules because Brown was not an approved resident and had multiple prior felony convictions. Also, he was cooking a tremendous amount of meth in the apartment.
¶4. Other residents of the apartment building complained to the manager that Hall’s apartment was emitting a foul odor. The manager notified residents that all units in the building would be searched to determine the source of the odor. The manager also notified law enforcement of her suspicion that the odor was related to drugs. Before law enforcement took any action, an officer with the City of Gautier Police Department personally warned Hall that he had information that Brown was cooking meth in the apartment and that she could lose her children and her apartment if she did not put a stop to it. This occurred in late August or early September of 2009.
¶ 5. Despite this warning, on September 10, 2009, Hall was arrested at her apartment complex after chemicals used to manufacture meth were found in her car. She told police that she had purchased the items for someone else, but she refused to identify the person. She was charged with possession of precursors, but proceedings in her criminal case were later stayed after she entered into a pretrial diversion agreement and program. As a result of her arrest, Hall was evicted from her apartment.
¶ 6. Brown had cooked so much meth in the apartment that it and three other nearby units were contaminated. The residents of those units had to move out and lost their furniture and personal possessions, which were also contaminated. The owner of the complex had to “gut [Hall’s apartment] to the studs” because of the contamination, and at least two of the affected units are still uninhabitable because decontamination was deemed too expensive.
¶ 7. Because of Hall’s arrest and the dangerous conditions inside her apartment, the youth court removed Ben and Kate from her custody and placed them in the custody of DHS. DHS placed Ben with his paternal aunt and uncle (his father’s brother and sister-in-law), Melvin and Kimberly Howard. DHS placed Kate with unrelated foster parents, Jerry and Tiffany Gordon. Hank was also removed from the home and placed in the custody of his legal guardian. His custody is not at issue in this case.
II. Reunification Efforts and Proceedings in the Youth Court
¶ 8. In February 2010, Hall entered into a service agreement with DHS with the goal of reunification with her children. See Miss.Code Ann. § 43-15-13(4) (Rev. 2015). The agreement required her to complete drug treatment and parenting classes, submit to random drug testing, and maintain-a safe and drug-free home.
¶ 9. In March 2010, the youth court held a permanency review hearing for Ben and Kate. A parent whose child has been placed in foster care has a maximum of six *1226 months to complete a DHS service agreement unless DHS “has documented extraordinary and compelling reasons for extending the time period in the best interest of the child.” Id. For children under the age of three, the law also requires DHS to initiate proceedings to terminate parental rights (TPR) unless it “has documented compelling and extraordinary circumstances.” Id. Because Hall had only recently entered into an inpatient drug treatment program, the youth court granted her an additional six months to complete her service agreement and scheduled the next permanency hearing for September 2010. In May 2010, Hall completed the inpatient drug treatment program and parenting classes.
¶ 10. On June 28, 2010, the youth court adjudicated Kate and Ben to be neglected children under the Youth Court Act. See id. § 43-21-561(3). The court’s order required Hall to complete a service agreement with DHS, submit to random drug testing, and establish and maintain á safe arid stable home and employment. The court also ordered Hall to complete an “after care” (drug counseling) program. The order permitted Hall to have super! vised weekly visitation with the children at DBS’s office. ■
¶ 11. The children’s next permanency review hearing was held ■ in September 2010. Hall, Brown, and Howard were all present. The report of the court-appointed guardian ad litem (GAL) reflects that at the time- of this hearing,' DHS and the GAL continued to support reunification efforts because it'appeared that Hall and Brown were making progress. However, the court was concerned that Hall had submitted little proof or documentation of compliance with her service agreement and that Brown -had not entered into .a service agreement. The court took the case under advisement to review the case file' and directed the parties to submit additional documentation. The court also ordered’ the parents to submit to drug tests, which Hall and Howard passed but Brown failed.
¶ 12.- In December 2010,- Hall entered into a second service agreement with DHS, which required her to attend drug counseling. The service agreement also reiterated her obligation to maintain a drug-free environment, which specifically included “staying clear of people [who] do drugs.”
. ¶ 13. Documentation submitted to the court after the September 2010 hearing showed that-Hall did attend some counseling sessions but not until December 2010, months after she had completed her residential treatment program-and was supposed to have started an after care program. In addition, the ■ director of a Christian twelve-step program -advised the court by letter that Hall had attended some meetings but had “missed- a lot of meetings” and seemed to be “using the program.”[3]- Finally, 'subsequent to the September,2010 hearing, Brown failed to follow through with the drug-treatment program that his service agreement required and again tested positive for drugs. The DHS family protection specialist assigned to the ease warned Hall that because Brown continued to use drugs and failed to comply with his service agreement, her continued relationship with him would be an obstacle to reunification. The DHS caseworker explained to Hall that it *1227 was important to separate herself from Brown, Nonetheless, Hall continued to live with Brown.
¶ 14. On January 20, 2Ó11, the court entered orders finding that reunification was no longer in the children’s best interest despite DHS’s reasonable efforts to reunify the children with their parents. The court specifically found that the parents remained unable to provide a safe, stable, and drug- and violence-free environment for the children. The court therefore ordered that the children should remain fin DHS custody and in their current placements. The court further found that it was in the children’s best interests to change their permanency plans from reunification to TPR and adoption and that all visitation between the children and their biological parents should cease.
¶ 15. For reasons that are not apparent from the record in this appeal, sixteen months passed before a TPR petition was filed on May 24, 2012.[4] A summons to Hall was issued on August 6, 2012, and she waived service on August 9, 2012,[5] The next week, Hall filed an answer , to the petition and a motion to recuse the youth court judge. Hall alleged that recusal was required because the judge had ordered the children’s permanency plan changed from reunification to TPR and adoption in the absence of a recommendation to that effect by DHS or the GAL. Hall also argued that the case should be transferred to the Jackson County Chancery Court, where a proceeding regarding her other child was already pending. On October 1, 2012, the court denied Hall’s motion..
¶ 16. On December 6, 2012, DHS filed a motion to voluntarily dismiss the TPR petition without prejudice. In its motion, DHS represented to the youth court that Hall had “made significant progress towards the completion of the service agreement and tasks identified by [DHS] to regain custody of her two children.” DHS further stated that it “would like to continue working toward reunification” between Hall and her children. ■
¶ 17. On December .18, 2012, Hall filed a motion to resume visitation with her children. Hall’s motion was based on DHS’s motion to voluntarily dismiss the TPR petition and its willingness to resume reunification efforts. Hall also, noted that visitation. had not been permitted during the nearly two years since the court’s January 2011 orders. Subsequently, Hall was allowed to resume supervised visitation with her children. ..
¶ 18. On March 26, 2013, the youth court denied DHS’s motion to voluntarily dismiss the TPR petition. DHS’s motion and the reasons for its filing were the subject of testimony at the subsequent TPR hearing. Melissa Nash, a DHS supervisor, testified that the motion was filed because “the evidence that [DHS] had at the time on the case” seemed to show that Hall “had done everything that was asked of her.” However, after filing the motion, *1228 DHS learned that Hall was continuing to maintain a relationship with Brown. Nash explained that DHS had been “under the assumption that [Hall] had broken ties with [Brown]” but later discovered that she had not done so and even continued to “travel[ ] to the jail where he was incarcerated to visit” him. Hall’s continued relationship with Brown concerned DHS not only because of the risk it posed to her children but also because it violated the terms of her pretrial diversion program and thus could send her back to jail.
¶ 19. In a March 2013 email that was admitted into evidence, Tanya Blair, a special assistant attorney general assigned to DHS, expressed frustration to DHS caseworkers regarding them change of position as to whether TPR was appropriate.[6] Blair testified at the hearing that she filed the motion to dismiss because Nash told her that DHS “did not feel termination was appropriate at the time in that from what they knew of the case at the time, it appeared [Hall] had completed her service agreement.” Blair testified that the agency’s position changed after the motion was filed because it discovered that Hall had continued her relationship with Brown after being warned that the relationship would be an obstacle to reunification and a possible violation of her pretrial diversion program. Blair stated that “the ongoing relationship with [Brown] is still the concern today.” Blair testified that she supported proceeding with the TPR petition after she was fully informed about Hall’s continued relationship with Brown.
III. Hearing on the TPR Petition
¶ 20. A final hearing was held on the petition over the course of six days in July, September, and October 2013. The court heard testimony from numerous witnesses regarding Hall’s compliance or noncompliance with her service agreements, her continued relationship with Brown, her relationships with her children, and the children and their relationships with their foster families. Hall was represented by counsel throughout the hearing.
A. Hall and Her Continued Relationship with Brown
¶ 21. Hall was twenty-nine years old at the time of the hearing. She testified that she dropped out of high school in the ninth or tenth grade and had always been in classes for children with learning disabilities. She also testified that she had been unable to obtain her GED despite taking a GED course.
¶ 22. After Hall completed an inpatient drug rehabilitation program in 2010, she moved back in with Brown. She did so even though she knew that he continued to use drugs and fail drug tests. She admitted that her DHS service agreement required her to maintain a drug-free home environment, that she could not do so while she lived with Brown and he continued to use drugs, and that she chose to live with him anyway. As noted above, she also failed to complete an “after care” program required by her DHS service agreement. She admitted that she used drugs regularly from the time she was a teenager until she was arrested and that she was using meth on a daily basis at the time of her arrest. However, at the TPR hearing she testified that she no longer considers herself an “addict” and did not think that she needed to attend any sort of counseling or narcotics anonymous-type program.
*1229 ¶23. In February 2011, Hall moved into a two bedroom/two bathroom mobile home where she has lived ever since. In addition, at the time of the hearing, she had been employed full-time at the same job as a housekeeper and front desk worker at, a condominium complex for nearly three years. Moreover, while Hall admitted that she was using drugs at the time of her arrest in 2009, she had passed all subsequent court-ordered and voluntary drug tests. Thus, based on the evidence presented at the TPR hearing, Hall has maintained the same residence, steady employment, and refrained from using drugs for a significant period of time. These are all positive facts.
¶24. Unfortunately, despite improvements in her own life, Hall also allowed Brown to move into the mobile home with her in 2011, and they continued to live together for most of 2011. Hall did so even though by this point the youth court had ordered the children’s permanency plans changed from reunification to termination of parental rights, at least in part because of her continued relationship with Brown, who indisputably continued to use drugs. DHS caseworkers, the GAL, and others had also warned her that her relationship with Brown would hinder or prevent her from regaining custody of her children.
¶ 25. Hall also admitted that prior to her arrest in 2009, DHS investigated Brown for alleged abuse of her oldest child, Hank.[7] Hall testified that she could neither admit nor deny that Brown abused her son because she “wasn’t there.” Incredibly, despite the high levels of contamination in the apartment she shared with Brown in 2009, Hall also denied that Brown or anyone else had ever cooked meth in the apartment.
¶26. Hall also admitted that in 2011, Brown stored stolen property—including a truck, trailer, and motorcycle—at her residence, although she testified that she did not know that it was stolen. In October 2011, police seized the stolen property and arrested Brown. Brown was incarcerated for much of 2012 and 2013. Hall admitted that in 2012 she went to visit him twice a month in the Stone County Correctional Facility, an hour-and-a-half round trip from her home. Even at the time of the final TPR hearing, Hall continued to write to Brown at least once a month. At times, she wrote to him under his mother’s name because she knew that she should not be doing so.
¶27. In May 2012, Kate’s foster parents, the Gordons, hired an investigator to determine whether Brown was still living with Hall. The investigator determined that Hall and Brown were still living together in her mobile home at that time. His report and video surveillance were admitted into evidence at the TPR hearing. This was eleven months after Hall’s attorney had written a letter to the youth court that stated in part: “The direction of this case seems to be that [Hall] cannot regain custody as long as she is living with [Brown].... I wish to advise the Court and all concerned entities that [Brown] is no longer residing in the household of [Hall].”
¶ 28. At the TPR hearing, Hall refused to answer questions about whether her *1230 continued relationship with Brown violated the terms of her pretrial diversion agreement in her criminal case, which required her to avoid associating with harmful or disreputable persons.[8]
¶29. Hall’s attorney argued that because Brown had pled guilty in federal court and was “going to be in jail for an extended period of time” his relationship with Hall was “no longer even relevant to the court’s consideration.” However, Brown had not been sentenced at the time this argument was made. According to the subsequent judgment in Brown’s criminal case and the Federal Bureau of Prisons website, he was sentenced to only thirty-one months in prison and was released while this appeal was pending. Moreover, DHS caseworkers and the GAL' testified that their concern was not limited to the direct threat that Brown posed to Hall’s children; they were also concerned that her ongoing, relationship with Brown violated the terms of her pretrial diversion program, which.could .land her back in jail, demonstrated a lack of commitment to her children, and showed a continued pattern of dangerously poor judgment and a propensity for associating with criminals and drug users.
B. Ben and His Foster Family ■
¶ 30. - .Ben was twenty-two months old when-he was taken into DHS custody. He was six years old at the conclusion of the final hearing in this matter. His father, Billy Howard, was in jail for possession of drugs and stolen property at the time he entered DHS custody. Ben was placed with his paternal uncle and aunt (his father’s brother and sister-in-law), Melvin and Kimberly Howard, in October 2009. Melvin and Kimberly have three children who were five, nine, and fourteen years old at the time of the final hearing. Their five-year-old son and Ben had grown very close and were described as “inseparable” and “almost like twins.”
¶ 31. Ben now calls his biological father “Uncle Billy” because that'is what his (foster) brother and sisters call 'him. Ben considers Melvin his father and calls him “Dad.” Billy volunteered at the hearing that his parental rights should be terminated so that Melvin and Kimberly can adopt Ben. Billy testified that it is in Ben’s best interest to live with Melvin and Kimberly rather than with himself or Hall. Ben was by all accounts a happy and healthy child at the time of the TPR hearing. He had bonded with 'his foster parents and siblings, and Melvin and Kimberly desire to adopt him.
¶ 32. In contrast, the GAL testified that she has not observed a “parental bond” between Hall and Ben. DHS employees and others testified similarly. ■ Melvin and Kimberly testified that Ben reacts negatively and is upset -after his supervised visits with Hall.
C. Kate and Her Foster Family
¶ 33. Kate has lived in the home of her foster, parents, Jerry and Tiffany Gordon, since she was taken into custody at the age of only six weeks. She was four years old at the time of the TPR hearing, Kate was the Gordons’ first foster child. They have cared for ten other foster children at different times, but at the time of the TPR heáring, Kate was the only foster child in their home. The Gordons also have two biological children, who were born after Kate came to live with them.
*1231 ¶ 34. Michele Allen, a psychotherapist who specializes in child and adolescent therapeutic services, believes that Kate has “atypical autism,” a disorder that “falls within the autistic spectrum of disorders.” The school district also diagnosed Kate with a possible autism spectrum disorder. Kate is unable to maintain conversation or eye contact. She flaps her hands, jumps up and down, or flings herself on furniture when she gets upset and has occasional “meltdowns.” She tends to repeat phrases spoken by others and is bothered by lights and loud noises. Kate has been attending a special needs preschool and will require long-term therapy and other services.
¶ 35. Kate is well cared for in the Gor-dons’ home, and the Gordons desire to adopt her. Allen observed that Kate has developed a “clear bond” and is very affectionate with Tiffany. Allen expressed “very serious concerns” about removing Kate from the Gordons’ home and the emotional impact that would have on her. Allen testified that it would be “disastrous” to remove her from “the only mother [she has'] ever known”—Tiffany. In contrast, the GAL and other witnesses observed no real “parental bond” between Kate and Hall.
IV. The Youth Court’s Ruling
¶ 36. On November 4, 2013, the youth court entered a judgment terminating the parental rights of all three biological parents and a separate opinion with findings of fact and conclusions of law.[9] The court found that reunification had not been .achieved within a reasonable period of time due to the parents’ ongoing behaviors that were contrary to the children’s interests and that adoption was necessary to secure stable placements for the children. See Miss.Code Ann. § 93-15-103(1) (Rev. 2013). The court also found by clear and convincing evidence that termination of Hall’s parental rights was warranted on four statutory grounds: First, Ben and Kate had been in DHS custody for over one year, and DHS had made diligent efforts to develop and implement a plan for reunification, but Hall had.failed,to complete her plan. See id. § 93-15-103(3)(d)(ii). Second, despite DHS’s diligent efforts, Hall had failed to eliminate behaviors identified by DHS as an obstacle to reunification. ■ See id. § 93-15-103(3)(e)(ii). Third, there had been “substantial erosion of the relationship” between Hall and her children that was caused, at least in part, by Hall’s actions. See , id. § 93—15—103(3)(f). Fourth, the children had been adjudicated abused and neglected, custody had been transferred to DHS for placement in foster care, and reunification was not in the children’s best interests. See id. § 93-15-103(3)(h).
¶ 37. The youth .court’s opinion included the following findings of fact supporting termination of parental rights:
11. ■ [Hall] failed and refused to discontinue her relationship with [Brown,] which places the children in danger if returned to her custody..
12. [Hall] placed her freedom in jeopardy by blatantly violating the terms and conditions of her pretrial ■ diversion program.
13. [Hall] failed to provide the Court, [DHS], [the GAL] and [Court Appointed Special Advocates] with ... truthful answers when questioned *1232 about her relationship with [Brown].
14. [Hall] failed to make her children a priority in her life, placing her relationship with [Brown] above the needs of her children.
15. [Hall] failed to complete her service agreement with [DHS] in a timely manner, if at all.
16. [Hall] continues to maintain a relationship with [Brown,] causing the Court to be unable to return her children to her custody.
17. A substantial erosion has occurred between [Hall] and her children ... due to her prolonged absence in their lives; the testimony revealed that [Ben and Kate] look to their foster parents for parental nurturing, guidance, and discipline.
18. The parental relationship between these children and [Hall] is nonexistent due to their young age at the time of custody and [Hall’s] failure ... to complete the requirements of reunification in a timely manner.
19. [Ben] ... and [Kate] ... have spent the majority of their lives in foster care because [Hall] failed to make them a priority.
20. [Hall] did not enter drug treatment until March 1, 2010, twelve months after the date of custody[10] even though, by her own testimony, she was a drug addict, using meth everyday; she did not attend an after-care program for approximately four months after the completion of inpatient treatment, even though the court ordered her to do so; furthermore, by her testimony, she immediately returned to her relationship with [Brown], also an admitted drug user, who did not receive drug treatment.
21.It was the opinion of [DHS] and the [GAL] that reunification was not in the best interest of [Ben and Kate]. These children have grown up and become members of other families who love, nurture and care for them as parents should care for their children.
¶ 38. Hall timely appealed from the judgment terminating her parental rights.
ANALYSIS
¶ 39. Hall’s brief on appeal identifies six issues that we combine and restate as four: (1) the youth court abused its discretion by denying her motion to recuse; (2) the youth court abused its discretion by admitting certain documents over Hall’s objection that DHS failed to respond to her discovery requests; (3) the youth court abused its discretion by allowing a DHS caseworker to give an opinion on the “ultimate issue”; and (4) DHS failed to prove valid grounds for termination of parental rights by clear and convincing evidence.
¶ 40. We review a trial judge’s denial of a motion to recuse under the “manifest abuse of discretion ” standard. Hathcock v. S. Farm Bureau Cas. Ins., 912 So.2d 844, 849 (¶ 11) (Miss.2005) (quoting Farmer v. State, 770 So.2d 953, 956 (¶ 6) (Miss.2000)). We also review a trial judge’s rulings on evidentiary issues and alleged discovery violations for abuse of *1233 discretion.[11] Finally, “[t]he appellate standard of review for youth court proceedings is the same as that which we apply to appeals from chancery court....” A.B. v. Lauderdale Cty. Dep’t of Human Servs., 13 So.3d 1263, 1266-67 (¶ 14) (Miss.2009). “[W]e will not disturb the trial court’s findings of fact where there is ‘credible proof from which a rational trier of fact may have found grounds for termination by clear and convincing evidence.’ ” Id. at 1267 (¶ 14) (quoting S.N.C. v. J.R.D., 755 So.2d 1077, 1080 (¶ 7) (Miss.2000)).
¶ 41. For the reasons explained below, we conclude that the youth court judge did not abuse her discretion and that there is sufficient evidentiary support for the findings underlying the judgment terminating Hall’s parental rights. Accordingly, we affirm.
I. The Motion To Recuse
¶42. “The law in Mississippi pertaining to the recusal of a judge has been amply addressed.” King v. State, 897 So.2d 981, 988 (¶ 12) (Miss.Ct.App.2004). “Under Canon 3E(1) of the Code of Judicial Conduct, ‘[j]udges should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances....’” Id. (quoting Rutland v. Pridgen, 493 So.2d 952, 954 (Miss.1986)). But the decision whether to recuse is committed to the discretion of the trial judge, and we will reverse only if that discretion is abused. Id.; M.R.AP. 48-B. Furthermore, we presume that the trial judge is qualified, impartial, and unbiased, and the party arguing that recusal was required must rebut that presumption. See King, 897 So.2d at 988 (¶ 13).
¶ 43. Hall argues that the youth court judge was required to recuse herself from the determination of the merits of the TPR petition because the judge directed DHS to file the petition.[12] We disagree. To begin with, the Supreme Court has made clear that the youth court judge, “having concern for the best interest and future of a minor child, has the authority to direct [DHS] to institute proceedings for the termination of parental rights.” In re T.T., 427 So.2d 1382, 1384 (Miss.1983); accord Oktibbeha Cty. Dep’t of Human Servs. v. N.G., 782 So.2d 1226, 1234 (¶ 41) (Miss.2001); In re V.R., 725 So.2d 241, 245-46 (¶¶ 18-20) (Miss.1998). Further, once the children were in DHS custody for twelve months and had been adjudicated as abused or neglected, the judge was required by law to hold a permanency hearing for the children to determine whether there was some reason that TPR was not in the children’s best interests. See Miss.Code Ann. § 43-21-613(3)(a)(i) (Rev.2015). Therefore, any suggestion that the youth court judge acted improperly by directing DHS to file the petition is mistaken.
¶ 44. Hall nonetheless argues that the judge was required to recuse from hearing *1234 the merits of the TPR petition for the same reasons that a judge who cites an individual for constructive criminal com tempt (i.e., contemptuous conduct that occurs in whole or in part outside of the judge’s presence) must recuse from the subsequent contempt proceedings. See Miss. Comm’n on Judicial Performance v. Harris, 131 So.3d 1137, 1143 (¶¶ 16-17) (Miss.2013). Hall’s analogy simply does not fit. The citing judge must recuse from constructive criminal contempt proceedings because he “has substantial personal involvement in the prosecution.” Id. at 1144 (¶ 21) (quoting Cooper Tire & Rubber Co. v. McGill, 890 So.2d 859, 869 (¶ 36) (Miss.2004)). If.the citing judge presided over the contempt proceedings, he would be “judging conduct said to challenge his authority or himself personally, frequently both.” Cook v. State, 483 So.2d 371, 376 (Miss.1986).
¶ 45. Here, in contrast, the youth- court judge’s directive to DHS to file a TPR petition was not based on the' judge’s “personal involvement” in the case. Nor was it a response to any personal affront to the judge or her authority. Rather, as discussed above, the judge directed DHS to file the petition becatíse—as required by law—she held a permanency hearing and made a determination regarding the children’s best interests. This was her duty as a judge. The law required her to rule; having done so, she was not required to recuse herself simply because she ruled against Hall. Although there are no Mississippi appellate decisions directly on point, courts in other states have concluded that recusal is not required in this scenario. See Lisa K. v. Ariz. Dep’t of Econ. Sec., 230 Ariz. 173, 281 P.3d 1041, 1048-49 (Ariz. Ct.App.2012); D.A. v. Dep’t of Children & Families, 132 So.3d 358, 359 (Fla.Dist.Ct. App.2014), rev. denied, 139 So.3d 884 (Fla. 2014); In re LaRue, 113 N.C.App. 807, 440 S.E.2d 301, 303 (1994), We agree with these courts and hold that the denial of Hall’s motion to recuse was not a manifest abuse of discretion.
II. Objections Based On Alleged Discovery Violations
¶ 46.' Hall next complains that the youth court judge “erre'd in' overruling [her] objection to the admission of any documentary evidence or witnesses when the State failed to respond to written discovery requests,” Near the beginning of the first day of. the. TPR hearing, Hall objected .to the admission, of her own mobile home lease agreement on the ground that DHS had not answered .her.discovery requests.. A year earlier, Hall had filed interrogatories and document requests with the court. Her discovery requests were directed “to the Youth Court of Jackson County” and served on all parties, including DHS. Hall’s' attorney also sent DHS a “good faith” letter regarding her discovery requests.. DHS - responded to the letter, in part, as follows: “As you know, the Jackson County Youth Court has an open discovery policy. Therefore, you can review, the Youth Court materials at any time.” Counsel for DHS also advised that she would provide responses from DHS “as soon as possible”; however, at the hearing, counsel stated that once she realized that the discovery was directed to the court, not DHS, she decided that no further response was necessary. Hall eventually filed a motion to compel, but she. never noticed the motion for a hearing or took any other steps to obtain a ruling prior to the final héaring' on the TPR petition. After hearing argument, the court overruled Hall’s objections to the lease agreement and several other exhibits.
*1235 ¶ 47. On appeal, Hall fails to identify any specific documents that unfairly surprised or prejudiced her. In addition, she does not cite, and we are unable to locate, any point at which she objected to “witnesses” on this ground. The documents to which she objected included her own lease, her own service agreements with DHS, and her own pretrial diversion agreement. It appears that the documents were part of the youth court file, and Hall’s attorney acknowledged that he already had copies of at least some of them. As noted above, DHS advised Hall’s attorney that he was free to review the youth court file “at any time.” This was consistent with applicable law. See Miss.Code Ann. § 43-21-261(3) (Rev.2015); U.R.Y.C.P. 5(a)(3); In re R.J.M.B., 133 So.3d 335, 340 (¶ 13) (Miss. 2013), Finally, Hall waived any alleged issue by failing to obtain a ruling on her motion to compel prior to the hearing on the TPR petition.[13] Thus, the issue is without merit for several reasons—Hall’s requests were directed to the court, not DHS; the documents were already in her possession or available for inspection in the youth court file; she waived the issue by failing to obtain a ruling on her motion to compel; and she identifies no possible prejudice that she suffered because these documents were admitted into evidence. Accordingly, the youth court judge did not abuse her discretion by overruling Hall’s objections.
III. Social Worker’s Opinion Testimony
 ¶ 48. Hall argues that the youth court judge erred by allowing LaShundra Finley, the DHS family protection specialist assigned to her.case, to testify as to whether there had been a substantial erosion in the relationship between Hall and the children and whether TPR was in the children’s best interests. Our Supreme Court has addressed this issue:
Dispositional hearings ■■ in youth courts are very informal, allowing for hearsay testimony as well as reports from various individuals or agencies who have information concerning the well being and “best interést” of the minors before the court. Social workers at disposi-tional hearings should therefore be allowed to give their opinions regarding the “best interest” of minors based upon their investigations and personal observations. Whether to allow testimony is determined by the sound discretion of the chancellor.
In Interest of R.D., 658 So.2d 1378, 1383—84 (Miss.1995) (emphasis added); see also Miss.Code Ann. § 43-21-603(5)(e) (Rev. 2015) (“If a child has been adjudicated a neglected child or an abused child, before entering a disposition order, the youth court shall consider :.. recommendations ... from ... the family protection worker or family protection specialist assigned to the case[.]” (emphasis added)). Thus, whether to allow Finley’s testimony was within the “sound discretion” of the youth court judge. The issue is without merit.
IV. Sufficiency of the Evidence
¶ 49. Hall argues that the youth court erred by terminating her parental rights *1236 because, in her view, she complied with her DHS service agreement; because DHS failed to prove grounds for termination by clear and convincing evidence; and because her continued relationship with Brown does not warrant termination.
¶ 50. The grounds for terminating parental rights are set out in Mississippi Code Annotated section 93-15-103. Hall’s appeal focuses primarily on whether there is clear and convincing evidence to support the chancellor’s finding of grounds for termination under subsection (3). However, the Supreme Court has held that “subsection (1) of the statute provides certain criteria which must be met prior to a consideration of the grounds for termination” of parental rights under subsection (3). In re Dissolution of Marriage of Leverock & Hamby, 23 So.3d 424, 428 (¶ 15) (Miss.2009) (emphasis added). Therefore, we will consider subsection (1) first.
A. Interpreting Subsection 93-15-103(1)
¶ 51. Subsection (1) provides as follows:
When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, ... the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights.
Miss.Code Ann. § 93-15-103(1) (emphasis added).
¶ 52. The key to interpreting the provision is determining how the word “or” is intended to connect or separate the rest of the paragraph. Viewed in isolation from related statutory provisions, subsection (1) logically could be read at least two different ways. It could be read as follows:
The court shall consider the grounds for termination of parental rights if either [1] the “child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or [2a] the parent is unable or unwilling to care for the child, [2b] relatives are not appropriate or are unavailable, and ... [2c] adoption is in the best interest of the child.”
Id. (emphasis added). We will refer to this possible interpretation as the “two alternatives interpretation.”
¶ 53. Alternatively, it could be read as follows:
The court shall consider the grounds for termination of parental rights if [1] either the “child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, [2] relatives are not appropriate or are unavailable, and ... [3] adoption is in the best interest of the child.”
Id. (emphasis added). We will refer to this possible interpretation as the “three elements interpretation.”
¶ 54. Thus, “or” could be read as separating two alternative ways to satisfy the subsection—a single criteria or a three-part test. Or the subsection could be read to establish one three-part test that ap *1237 plies in all cases, with “or” separating alternative criteria that satisfy the first part only. Because either reading is possible, we look to relevant rules of statutory construction for guidance.
¶ 55. “The function of the Court is not to decide what a statute should provide, but to determine what it does provide.” Lawson v. Honeywell Int’l Inc., 75 So.3d 1024, 1027 (¶ 7) (Miss.2011) (emphasis added). When a statute is subject to more than one possible interpretation, “we look to ... rules of statutory construction for guidance.” Tunica Cty. v. Hampton Co. Nat’l Sur. LLC, 27 So.3d 1128, 1133 (¶ 14) (Miss.2009). Among these, ,“[i]t is a well-settled rule of statutory construction that when two statutes pertain to the same subject, they must be read together in light of legislative intent.” Id. at (¶ 15). Indeed, “in construing statutes in pari materia, ... all of the relevant statutes must be taken into consideration, and a determination of legislative intent must be made from the statutes as a whole.” Martin v. State, 501 So.2d 1124, 1127 (Miss.1987). A related rule is that “[e]ven when statutes are in apparent conflict, they should if possible be construed in harmony with each other to give effect to each.” Carl Ronnie Daricek Living Trust v. Hancock Cty. ex rel. Bd. of Sup’rs, 34 So.3d 587, 599 (¶ 25) (Miss.2010) (quotation marks omitted). We also “have a duty to give statutes a practical application consistent with their wording, unless such application is inconsistent with the obvious intent of the legislature.” Miss. Ethics Comm’n v. Grisham, 957 So.2d 997, 1001 (¶ 12) (Miss.2007) (quoting Marx v. Broom, 632 So.2d 1315, 1318 (Miss.1994)) (emphasis omitted). Finally, “no construction is ever to be adopted which charges the legislature with absurdity, when any other reasonable view can be taken.” Seal v. Andrews, 214 Miss. 215, 227, 58 So.2d 504, 507 (1952). Thus, when a statute is “subject to multiple interpretations,” we will, if possible, avoid “interpret[ing] the statute in such a way as to cause absurd results.” Dawson v. Townsend & Sons Inc., 735 So.2d 1131, 1140 (¶ 37) (Miss.Ct. App.1999) (citing Sheffield v. Reece, 201 Miss. 133, 143, 28 So.2d 745, 749 (1947)). We now consider subsection 93-15-103(1) with these rules in mind.
¶ 56. Subsection 93-15-103(1) was last amended during the 1998 legislative session, with the only amendment, being the addition of the clause “relatives are not appropriate or are unavailable.” 1998 Miss. Laws ch. 516, § 10 (S.B.2173). In that same bill—indeed, in the very next section of the bill—the Legislature also amended Mississippi Code Annotated section 93-15-107 to add the following new subsection (2):
[DHS] shall initiate proceedings to terminate parental rights in accordance with Section 93-15-101 et seq. in cases where'a-child has been placed in the physical custody of a relative and [DHS] has been given legal custody of the child. [DHS] may provide necessary funds to defray the costs and attorney fees for any adoption proceedings brought by the relative of such child in cases where the relative is unable to pay such costs and fees based on criteria established by [DHS]....
1998 Miss. Laws ch. 516, § 11 (S.B.2173) (emphasis added). Section 93-15-107 has not been amended since; thus, DHS remains subject to this directive to initiate TPR proceedings.
¶ 57. Recall that the “three elements interpretation” of subsection 93-15-103(1) *1238 would make proof that “relatives are not appropriate or are unavailable” a mandatory prerequisite to termination of parental rights in all cases. However, such an interpretation would be irreconcilable with subsection 93-15-107(2)⅛ clear directive that “DHS shall initiate proceedings to terminate parental rights ... in cases where a child has been placed in the physical custody of a relative (Emphasis added). Where a child has already been placed in the physical custody of a relative, it necessarily follows that at least one relative is appropriate and available. Thus, the second possible interpretation of subsection 93-15-103(1)—the three elements interpretation—would impute to the Legislature an intent to categorically prohibit the termination, of parental rights in the very category of cases in which, in the very same bill, it directed DHS to initiate TPR proceedings.
¶ 58. In contrast, the “two alternatives interpretation” of subsection 93-15-103(1) would permit the chancellor to consider whether grounds for termination exist in all cases in which the “child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child.” This describes a typical DHS case—DHS is the agency tasked with the responsibility of removing an abused or neglected child “from the home of [his or her] natural parents.” This interpretation would then permit DHS to comply with subsection 93—15—107(2)’s directive to initiate TPR proceedings in cases in which an appropriate relative is available for placement and eventual adoption.[14]
¶ 59. As discussed above, we must read these statutes together and, if possible, interpret them in such a way as to avoid conflict between the two. If possible, we must give them a practical application, consistent with their plain language, and avoid any interpretation that would yield absurd results. Here, where the plain language of subsection 93-15-103(1) is open to either of two permissible interpretations, we should not interpret the provision in a way that would nullify subsection 93-15-107(2), a related and complementary statutory provision. Instead, we should interpret subsection 93-15-103(1) in a way that will give effect to subsection 93-15-107(2). That is, we should interpret it as directing the youth court to consider whether there are grounds for termination of parental rights if either [1] the “child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or [2a] the parent is unable or unwilling to care for the child, [2b] relatives are not appropriate or are unavailable, and ... [2c] adoption is in the best interest of the child.” Miss. Code Ann. § 93-15-103(1) (emphasis added).
¶ 60. We acknowledge that prior opinions numbered the prerequisites differently—i.e., as outlined above in the “three elements interpretation.” However, none of those opinions specifically considered the interpretive issue discussed herein, and in each of those cases, the result would have been the same regardless of how the prerequisites were enumerated. *1239 See Chism v. Bright, 152 So.3d 318, 323 (¶ 16) (Miss.2014) (reversing an order terminating parental rights because the child was not “removed from the home of his natural parents,” nor was the parent “unable or unwilling” to care for him); Leverock, 23 So.3d at 428-29 (¶¶ 15-16) (similar); Pritchett v. Pritchett, 161 So.3d 1106, 1114 (¶ 17) (Miss.Ct.App.2015) (reversing an order terminating parental rights because the child was never “removed from the home,” relatives were “available,” and “there was no evidence that adoption was in the best interest of the children”).
¶ 61. In this case, in contrast, the proper enumeration of the prerequisites matters a great deal with respect to at least one of the two children involved. As discussed above, Ben presently lives with an aunt and uncle who desire to adopt him— they are appropriate and available. If we were to interpret subsection 93-15-103(1) precisely as suggested in Chism, Leverock, and Pritchett, this fact alone would preclude termination of Hall’s parental rights with respect to Ben. It would also lead to different outcomes for Ben and Kate—and permit adoption of one but not the other— even though the grounds for TPR are the same for both.
¶ 62. For two reasons, we conclude that the appropriateness and availability of Ben’s aunt and uncle do not preclude the termination of parental rights. First, Hall has quite simply waived that argument. She has never mentioned the issue as a basis for dismissing the petition in either this Court or the youth court. Issues not raised in the court below are waived. Pub. Emps’ Ret. Sys. v. Freeman, 868 So.2d 327, 330 (¶ 9) (Miss. 2004). The same is true of issues not raised in the appellant’s initial brief. Sanders v. State, 678 So.2d 663, 670 (Miss.1996).
¶ 63. Second, notwithstanding Hall’s apparent waiver, we also decide the merits of the interpretive issue, We do so because the Supreme Court has stated in seemingly mandatory terms that “subsection (1) of the statute provides certain criteria which must be met prior to a consideration of the grounds for termination” of parental rights under subsection (3). Leverock, 23 So.3d at 428 (¶ 15) (emphasis added). On this issue, we conclude that the precise enumeration of the prerequisites in Chism, Leverock, and Pritchett was not necessary to those rulings and, thus, may be considered dicta.[15] The conclusion that subsection (1) sets out prerequisites was important to each of those decisions; however, precisely how those prerequisites should be enumerated was not necessary to any of them. It was not necessary because, as noted above, in each of those cases, multiple prerequisites were not met, and the result would have been the same regardless of how they were enumerated. See Chism, 152 So.3d at 323 (¶ 16); Leverock, 23 So.3d at 428-29 (¶¶ 15-16); Pritchett, 161 So.3d at 1114 (¶ 17). In addition, we note that none of those three cases involved children in DHS custody or a TPR petition filed by DHS. All three involved TPR petitions filed by private parties against the child’s father. Thus, those cases did not implicate DHS’s statutory directives to pursue TPR and adoption by relatives as an alter-ative to reunification. See Miss.Code Ann. §§ 43-15-13(3) & 93-15-107(2). Having *1240 now considered this specific interpretive issue in a case in which it is essential to the outcome, we hold that subsection (1) should be interpreted as discussed above in paragraphs 52 and 57-58—the “two alternatives interpretation.”
B. Applying Subsections 93-15-103(1) and (3)
¶ 64. Grounds for the termination of parental rights must be established “by clear and convincing proof.” ■ Miss.Code Ann. § 93-15-109 (Rev.2013). As discussed above, the youth court found by clear and convincing evidence that Hall’s ongoing behavior prevented reunification within a reasonable period of time following the children’s removal from her custody, see id. § 93-15-103(1), as well as four different statutory grounds for termination. These issues overlap and so we address them together. The relevant statutory provisions are as follows:
(1) When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child ..., the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
[[Image here]]
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
[[Image here]]
(d)When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
[[Image here]]
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
[[Image here]]
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or
[[Image here]]
(h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the child’s parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
*1241 Id. § 93-15-103(1), (3)(d)(ii), (3)(e)(ii), (3)(f) & (3)(h). While section 93-15-103(1) provides that the grounds for TPR may be considered “in combination,” only one statutory ground is necessary to justify termination. W.A.S. v. A.L.G., 949 So.2d 31, 35 (¶ 11) (Miss.2007). “Once the clear and convincing burden has been met, the best interest of the child is to be considered.” S.R.B.R. v. Harrison Cty. Dep’t of Human Servs., 798 So.2d 437, 443 (¶22) (Miss. 2001). Parental rights should be terminated only if the court determines that termination is in the child’s best interest. See id. (¶¶ 24-25).
¶ 65. Addressing these overlapping issues in turn, we first conclude that there was credible proof from which a rational trier of fact could have found that Ben and Kate could not be returned to Hall within a reasonable period of time because returning them to her would have been damaging to them. See Miss.Code Ann. § 93-15-103(1); A.B., 13 So.3d at 1266-67 (¶ 14). These young children were taken into DHS custody because Hall and Brown were not only using meth on a daily basis but also cooking a quantity of meth' sufficient to thoroughly contaminate their own apartment and three other units. This was a clear and serious danger to the children, then only twenty months old and six weeks old, respectively. While Hall subsequently made improvements in her own life, Brown did not. He continued to use drugs and engage in criminal activity. Nonetheless, Hall made a deliberate decision to continue to live with him and to have a relationship with him. She did so despite repeated warnings that the relationship would prevent her from regaining custody of her children. Over two and a half years after DHS took custody of her children, Hall continued to reside with Brown when he was not in jail and to visit him regularly when he was incarcerated. Brown’s continued drug use was an ongoing danger to Hall’s children, even aside from evidence that he had abused Hall’s oldest son and another child. Clearly, Hall’s continued relationship with Brown prevented the children from being returned to her home within a “reasonable period of time.” Miss.Code Ann. § 93-15-103(1). Indeed, state law requires DHS to file a TPR petition for any neglected child who has been in foster care for fifteen of the prior twenty-two months. See id. § 43-15-13(3). Here, Ben and Kate had been in DHS custody for fifteen consecutive months by the time of the youth court’s January 2011 orders, and Hall continued to live and have a relationship with Brown long after that point.
¶ 66. We also conclude that there was credible evidence to support the youth court’s finding that Hall’s failure to comply with her service agreement prevented her children from being returned to her after more than a year in DHS custody. See id. § 93—15—103(3)(d)(ii); A.B., 13 So.3d at 1266-67 (¶ 14). Hall’s argument on appeal is that the youth court penalized her for her relationship with Brown despite her compliance with her service agreement. What Hall even now fails to accept is that Brown’s continued drug use and her continued relationship and cohabitation with him was itself a violation of her service agreements, which required her to maintain a drug-free home for her children and to “stay[] dear of people who do drugs.” (Emphasis added). Given the dangerous conditions that resulted in these small children being placed in DHS custody to begin with, this was an essential component of Hall’s reunification plan. By continuing to live with and have a relationship with Brown, while he continued to use drugs, *1242 Hall failed to maintain a drug-free home and obviously failed to stay clear of people who do drugs.
¶ 67. Next, we find that there was credible evidence that, despite diligent efforts by DHS, Hall failed to eliminate behaviors that prevented the placement of Ben and Kate in Hall’s home. See Miss.Code Ann. § 93-15-103(3)(e); A.B., 13 So.3d at 1266-67 (¶ 14). The behavior at issue was Hall’s continued cohabitation and relationship with Brown even while he continued to use drugs. ' There was credible testimony that this behavior continued despite warnings that it would prevent reunification.
¶ 68. We also find that there was sufficiént proof that there had been a “substantial erosion of the relationship” between Hall and her children that was caused at least in part by Hall’s actions. See Miss.Code Ann. § 93-15-103(3)(f); A.B., 13 So.3d at 1266-67 (¶ 14). Because of Hall’s own choices, she was unable to regain custody of her children within a reasonable period of time. Testimony established that this was especially damaging because the children were only twenty months and six weeks old, respectively, when they were placed in" foster care. There was ample testimony that these children now view their foster families as their real families and have developed strong bonds' with their foster parents and foster siblings. In contrast, witnesses testified that there was no observable bond between Hall and the children. Their interactions were described as akin to a babysitter playing with children. Accordingly, the youth' court’s finding on this issue is supported by credible evidence.
¶69. Finally, we find that there was sufficient proof that Ben and Kate had been adjudicated to be neglected children and that reunification was not in their best interests. See Miss.Code Ann. § 93-15-103(3)(h); A.B., 13 So.3d at 1266-67 (¶ 14). There is no dispute that the youth court adjudicated them • as neglected in June 2011. Moreover, the youth court heard credible testimony that it would be harmful to the children to remove them from the foster families that had cared for them for most of their young lives. The youth court, also heard credible concerns that reunification would be contrary to the children’s best interests because of Hall’s continued relationship with Brown.
¶ 70. Having found that there was credible proof to support the youth court’s findings, by clear and convincing evidence, of four different statutory grounds for terminating parental rights, we now consider whether there .was also sufficient evidence to support the court’s conclusion that the termination of Hall’s parental rights was in the best interests of Ben and Kate’. See S.R.B.R., 798 So.2d at 443 (¶¶ 22, 24-25); A.B., 13 So.3d at 1266-67 (¶ 14). For essentially the same reasons that we affirm the youth court’s conclusion that reunification was not in the children’s best interests, we also affirm .its conclusion that TPR was in their best interests. Kate has lived with the Gordons, since she was six weeks , old and has developed a clear bond with them, The Gordons have cared for Kate, they have seen that she receives necessary, services for her autistic disorder, and they now desire to adopt her. Ben has lived with the Howards since he was twenty-two months old, he considers Melvin and Kimberly his mom, and dad, and he considers their children his siblings. The Howards .also desire to adopt Ben. In short, time did not stand still while Hall’s, continued cohabitation and relationship with Brown prevented her from re *1243 gaining custody of her children. During that time, Ben and Kate grew up and bonded with new families. Thus, there was credible evidence to support the youth court’s finding that termination of Hall’s, parental rights and adoption were in the children’s best interests. See R.F. v. Lowndes Cty. Dep’t of Human Servs., 17 So.3d 1133, 1136, 1138-39 (¶ 9, 18) (Miss.Ct.App.2009).
¶71. In summary, there was credible evidence to support the youth court’s ruling that all requirements of section 93-15-103 had been established by clear and convincing proof and that termination of Hall’s parental rights was in the best interests of the minor children.
CONCLUSION
¶ 72. ■ The youth court did not abuse its discretion in denying Hall’s motion to re-cuse or in overruling her evidentiary objections. In addition, ’there is sufficient evidence to support the court’s judgment terminating parental rights. Accordingly, we affirm.
¶ 73. THE JUDGMENT OF THE JACKSON COUNTY YOUTH COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., NOT PARTICIPATING.

. Brown apparently has at least six additional children with various other women. Most of his children have been placed in the custody of DHS, in a children’s home, or with third parties or relatives. In most of these cases, it appears that Brown pays no child support and has no relationship with the child. Of these children, only Kate is at issue in this case.

. At the TPR hearing in 2013, the program director testified that Hall’s attendance and ■ attitude improved after he wrote this -letter; however, he also testified that Hall never completed the program's twelve, steps and that he had -,not seen her in a long time.

. In the interim, Hall attempted to appeal the youth court’s January 20, 2011 orders, but on November 10, 2011, the Mississippi Supreme Court dismissed her appeal because there was no final appealable judgment. Hall subsequently filed a petition for a writ of mandamus in which she asked the Supreme Court to order the youth court to either issue a final appealable judgment or initiate TPR proceed-togs; however, the Supreme Court denied her petition on February 22, 2012. Hall was represented by counsel in both appellate proceedings.

. Billy Howard was served in November 2012. Brown waived service in February 2013,

. The email was disclosed because a DHS caseworker copied it into the agency’s electronic case management file.

. Brown reportedly choked the child to the point he could not breathe and then threw him to the floor, leaving bruises and abrasions on his neck—all as punishment for not cleaning his room. DHS also investigated Brown for alleged abuse of another child. The record is unclear as to the ultimate disposition of these investigations.

. Hall's testimony frequently was evasive, nonresponsive, or simply not credible. She answered a number of questions with “no comment” or by "pleading the Fifth.”

. Because neither Brown nor Howard appealed, we do not address aspects of the court’s judgment, findings, or conclusions that relate solely to them.

. This specific statement is erroneous, as March 2010 was only six months after the date of custody.

. See Hayes v. Entergy Miss., Inc., 871 So.2d 743, 747 (¶ 11) (Miss.2004) (alleged discovery violations); Redhead v. Entergy Miss., Inc., 828 So.2d 801, 806 (117) (Miss.Ct.App.2001) (evidentiary rulings).

. The record on appeal does not include a transcript of the September 2010 permanency hearing. Thus, we are unable to determine precisely what recommendations DHS or the GAL may have made at the hearing. However, as noted above, the GAL's report reflects that DHS and the GAL continued to support reunification at that time based on their belief that both Hall and Brown were making progress.

. See, e.g., Cossitt v. Federated Guar. Mut. Ins., 541 So.2d 436, 446 (Miss.1989) ("[I]t is a familiar and recognized rule that a trial judge is not to be charged with knowledge of every paper filed with the court clerk. It is not the duty of the judge to search out and bring up such matters, but the affirmative duty rests upon the party filing the motion to follow up his action by bringing it to the attention of the trial court.” (citing Dyer v. State, 300 So.2d 788, 789 (Miss.1974))).

. See also Miss.Code Ann. § 43-15-13(3) ("The goal of [DHS] shall be to return the child to its natural parent(s) or refer the child to the appropriate court for termination of parental rights and placement with a permanent relative....”).

. Magee v. State, 152 So.3d 1193, 1196 n. 4 (Miss.Ct.App.2014) (“Dicta are statements 'not necessary to the court’s ruling.’ ” (quoting Smith v. Normand Children Diversified Class Trust, 122 So.3d 1234, 1237 (¶ 5) (Miss.Ct.App.2013))).