## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01059-COA

**C.S.H.**                                                                                    **APPELLANT**

**v.**

**LOWNDES COUNTY DEPARTMENT OF**                                     **APPELLEE**
**HUMAN SERVICES**

DATE OF JUDGMENT:               05/13/2015
TRIAL JUDGE:                    HON. BEVERLEY MITCHELL FRANKLIN
COURT FROM WHICH APPEALED:      LOWNDES COUNTY COUNTY COURT
ATTORNEY FOR APPELLANT:         GARY GOODWIN
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: KURT STEVEN SAUL JR.
NATURE OF THE CASE:             CIVIL - OTHER
DISPOSITION:                    AFFIRMED: 05/01/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**TINDELL, J., FOR THE COURT:**

¶1.     The Lowndes County County Court terminated CSH's parental rights to her two sons,

Leo and Quinn.[1]  On appeal, CSH raises several issues, which we restate as follows:  (1)

whether the county court failed to apply the statutory prerequisites for parental-rights

termination; (2) whether the county court erroneously found the statutory prerequisites were

met by clear and convincing evidence; and (3) whether the county court erroneously found

---

[1] Although the county court also terminated the parental rights of the children's
unknown putative father, that portion of the judgment is not before this Court for review.
To protect the privacy and anonymity of the minor children involved in this case, we refer
to the Appellant by her initials, and we use fictitious names for the children and their foster
parents.

the statutory grounds for parental-rights termination were met by clear and convincing evidence.

¶2.    Finding no error, we affirm the county court's judgment.

**FACTS**

¶3.    CSH is the biological mother of Leo, born July 2007, and Quinn, born June 2008. Following a June 11, 2008 hearing, the Lowndes County Youth Court found CSH had "neglected and/or abandoned" eleven-month-old Leo. That same day, with the goal of eventually being reunited with Leo, CSH entered into an individualized service plan with the Lowndes County Department of Human Services (DHS). *See* Miss. Code Ann. § 43-15-13(4) (Rev. 2015). By signing the service agreement, CSH agreed to (1) obtain housing and maintain utilities; (2) obtain employment; (3) submit to random drug tests; (4) enroll in a drug-treatment program and attend Alcoholics Anonymous (AA) meetings; and (5) request monthly visits with Leo. The following day, on June 12, 2008, the youth court entered an order that placed Leo in DHS's custody and provided for a six-month review of the matter.

¶4.    Two months later, on August 12, 2008, the youth court found CSH had also neglected her younger son, Quinn. The youth court ordered three-month-old Quinn to also be placed into DHS's custody, and the court scheduled a six-month review. Unlike Leo's hearing, CSH failed to attend Quinn's August 12, 2008 hearing. Although the youth court's August 12, 2008 order made no mention of CSH entering into a second service agreement, the record reflects that, on November 3, 2008, CSH and her caseworker reinitialed the previous service agreement from June 11, 2008.

2

¶5.    On June 3, 2009, the youth court held Leo's permanency-review hearing, which CSH attended. By order entered August 5, 2009, the youth court determined that Leo was doing well with his foster parents and that CSH had failed to complete the terms of her service agreement. The youth court ordered that Leo remain in DHS custody, with reunification designated as his permanent plan and adoption designated as his alternate plan. Although the youth court found that termination of parental rights was not currently in Leo's best interest, the court decided to revisit the issue after granting CSH an additional six months to make progress on her service agreement. The youth court ordered that CSH be admitted to an inpatient drug-treatment program and that she complete her service-agreement requirements. The court further ordered DHS to help CSH find an inpatient drug-treatment facility.

¶6.    On the same day as the August 5, 2009 order for Leo, the youth court held a permanency-review hearing for CSH's younger son, Quinn. Unlike Leo's hearing, CSH was not in attendance for Quinn's August 5, 2009 permanency-review hearing. In its August 5, 2009 order related to Quinn's permanency-review hearing, the youth court noted the following: Quinn had cocaine in his system when he was born, which prompted DHS to remove him from CSH's custody; Quinn was currently doing well with his foster parents; and CSH had failed to complete the terms of her service agreement. After reviewing the evidence and determining that parental-rights termination served Quinn's best interest, the youth court changed Quinn's permanent plan from reunification to adoption.

¶7.    On December 2, 2009, the youth court conducted an annual review of Leo's case.

3

Barbara Williams, the social worker assigned to both Leo's and Quinn's cases, testified that Leo had been in DHS's custody since about May 2008. Williams stated that CSH had been scheduling visits with her sons and that the children had appeared to warm up to CSH during the last two visits. Williams also testified, though, that CSH had not completed any part of her service agreement and had tested positive for cocaine in both June and July 2009. After the two failed drug tests, the drug-rehabilitation program working with CSH recommended that she enroll in an inpatient drug-treatment program. Williams admitted, however, that CSH, who was unemployed and received no federal assistance, lacked the means to pay for the inpatient treatment. After testifying that Leo needed permanence, Williams recommended that the youth court terminate CSH's parental rights.

¶8. After reviewing Leo's case, the youth court entered a new permanency order on September 23, 2010, effective from the time of the December 2, 2009 hearing. The youth court concluded that parental-rights termination served Leo's best interest "[d]ue to [CSH's] failure to complete the terms of her service agreement[,] and due to the young age of [Leo] and the length of time [he] has been in foster care[.]" The youth court therefore changed Leo's permanent plan to adoption and ordered DHS to proceed with parental-rights termination.

¶9. On May 13, 2011, DHS filed a petition to terminate CSH's parental rights to both Leo and Quinn. Almost four years later, after numerous continuances, the county court conducted a hearing on March 9, 2015. During the four-year delay, CSH successfully completed an inpatient drug-treatment program, got married, and gave birth to a daughter, who was about

4

four years old.

¶10. At the termination hearing, Williams testified that she became involved with the case in May 2008 when DHS received a 911 report about Leo. Upon investigating, Williams discovered that CSH had left Leo with a non-relative for about four months. The non-relative could no longer care for Leo, and CSH's whereabouts were unknown. DHS took Leo to a doctor, who admitted him to the hospital for an abscess near his groin and upper respiratory issues. The following month, in June 2008, CSH gave birth to Quinn. After Quinn tested positive for cocaine, DHS took custody of him at the hospital. Williams confirmed that Leo and Quinn had remained in DHS's custody since they entered in 2008.

¶11. According to Williams, CSH partially complied with her June 2008 service agreement. Williams explained that CSH had six months to make progress on her service agreement and that the youth court even granted her an additional six months to complete the requirements. Starting around November 2008, CSH began to schedule and attend visits with her children. She also obtained housing when she married her husband, but she never obtained employment or attended AA meetings. Although CSH eventually completed an inpatient drug-treatment program, Williams testified that she did so outside the allotted time frame. Williams stated that, between November 2008 and January 2010, CSH continued to struggle with drug use. Then, in January 2010, CSH entered an inpatient drug-treatment program. Despite CSH's eventual completion of the program around May 2010, Williams testified that she no longer tried to reunify CSH with her children because the youth court had already changed the children's permanent plan to adoption. However, Williams acknowledged that,

5

after CSH had completed the inpatient program in 2010, she had passed all her subsequent random drug tests and done everything she could to satisfy the service-agreement requirements to regain custody of her children. Williams also testified she was satisfied that CSH presented no danger of neglect or abuse to her almost four-year-old daughter, who lived with CSH and her husband.

¶12. Having observed CSH's visits with Leo and Quinn, Williams testified there had been substantial erosion of the mother-child relationship due to CSH's absence during the first few months of the boys' lives. By contrast, Williams stated that Leo and Quinn had bonded with their foster family, who took care of all the boys' needs. Williams averred that DHS had done all it could to help CSH timely complete her service-agreement requirements for reunification. Williams also stated that, in her professional opinion, termination of CSH's parental rights served Leo's and Quinn's best interest.

¶13. The children's pediatrician next testified that both boys were relatively healthy, although Leo experienced occasional wheezing and eczema and Quinn had been diagnosed with ADD/ADHD. The pediatrician stated that Quinn needed to remain on his current ADD/ADHD medications for the foreseeable future but could hopefully learn to manage the condition on his own. The pediatrician also testified that, while all children benefit from a stable and consistent environment, children with ADD/ADHD especially need such an environment. Based on her observations of Leo's and Quinn's interactions with their foster parents, the pediatrician testified that the boys had bonded with their foster family.

¶14. Leah Headings, a private-practice clinical social worker, next testified that DHS

6

referred Leo and Quinn to her in December 2012 to assess the boys' adjustment to their foster home and the effects of their monthly visits with CSH. Headings formed her assessment after completing twenty-four individual sessions with each child. Headings concluded the children were thriving in their foster placement and considered their foster parents to be their mother and father. Headings testified Leo eventually seemed to grasp that, along with his foster mother, CSH was also his mother. However, Headings stated she never saw any indication that Quinn understood CSH's relationship to him. In Headings's opinion, removing the boys from their current foster-care placement "would be totally devastating[ and] confusing and would have lifelong implications" on the children. She further testified that she believed it was in the boys' best interest to remain with their foster parents.

¶15. Mary Reese, a DHS adoption specialist, next testified about the visits she observed between CSH and the boys. Reese testified that Leo and Quinn appeared to lack a strong bond with CSH. Reese stated the boys never ran up and greeted CSH at the beginning of the visits, nor did they appear disappointed when the visits ended. According to Reese, CSH had to initiate most of the interaction with the boys. By contrast, Reese said that Leo and Quinn possessed a strong bond with their foster parents, whom they identified as their actual parents. Reese testified she believed remaining with their foster parents served the children's best interest because that was the only home the boys had ever really known.

¶16. Leo and Quinn's foster parents, the Smiths, also testified that they had a strong bond with the boys and that the boys considered the Smiths to be their parents. The Smiths stated they had observed no similar attachment between the boys and CSH. If the court terminated

7

CSH's parental rights, the Smiths expressed their desire to adopt the boys. The Smiths further testified that they believed removing Leo and Quinn from their home would negatively affect the children.

¶17. CSH next testified about the children's removal from her custody and her attempts at reunification. CSH first began using drugs when she was fourteen. Although she was not on drugs at the time of Leo's birth in 2007, CSH testified that she subsequently relapsed. She left Leo with a friend, and then DHS took custody of him. CSH managed to stop using drugs again for a short time but suffered a relapse while pregnant with Quinn. Because Quinn tested positive for cocaine as a newborn, DHS took custody of him at the hospital. In January 2010, while pregnant with her daughter, CSH entered an inpatient drug-rehabilitation program. CSH completed the program in May 2010. In August 2010, CSH got married, and she testified that she had remained drug free since then. CSH stated that the monthly one-hour visits with Leo and Quinn failed to provide sufficient time to bond. Although she admitted that Leo and Quinn viewed the Smiths as their parents, CSH thought she could establish a strong bond with her children if the court returned them to her custody. CSH further stated that she and her husband possessed sufficient resources to financially support Leo and Quinn if the court returned them to her.

¶18. The guardian ad litem (GAL) testified that, although CSH appeared to be a fit parent to her daughter, he noticed a stark difference in CSH's interactions with her daughter and with Leo and Quinn. While the daughter clearly viewed CSH as her mother, the GAL testified that Leo and Quinn obviously did not. The GAL stated that CSH had even admitted

to him that her relationship with her sons had eroded and that they viewed the Smiths as their parents. Based on his observations and case-file review, the GAL recommended that remaining with the Smiths would serve the children's best interest.

¶19. On May 14, 2015, the county court entered a judgment finding that clear and convincing evidence supported multiple statutory grounds for the termination of CSH's parental rights. The county court found as follows: First, CSH failed to exercise reasonable available visitation with the children. *See* Miss. Code Ann. § 93-15-103(3)(d)(i) (Rev. 2013).[2] Second, CSH failed to implement her agreed-upon service plan, which prevented DHS from returning the children to her. *See id.* § 93-15-103(3)(d)(ii). Third, she "exhibit[ed] ongoing behavior [that] would make it impossible to return [the children] to [her] care and custody because [she] has a diagnosable condition, drug addiction, unlikely to change within a reasonable time, which . . . makes [her] unable to assume minimally[] acceptable care of [the children.]" *See id.* § 93-15-103(3)(e)(i). Fourth, she "failed to eliminate ongoing behavior, identified to [her] by [DHS]," despite DHS's diligent efforts to assist her. *See id.* § 93-15-103(3)(e)(ii). Fifth, there had been substantial erosion of CSH's relationship with the children, caused in part by her "prolonged and unreasonable absence" and "unreasonable failure to visit or communicate[.]" *See id.* § 93-15-103(3)(f). Sixth, the youth court, "a court of competent jurisdiction[,]" had previously determined that reunification with CSH was not in the children's best interest. *See id.* § 93-15-103(3)(h).

---

[2] Although the county court cited the 2002 Supplement to Mississippi Code Annotated section 93-15-103 in its judgment, this Court cites to and applies the 2013 version of the statute since it was in effect at the time CSH's parental rights were terminated.

¶20. Aggrieved by the termination of her parental rights, CSH appeals.

## STANDARD OF REVIEW

¶21. The county court's "findings of fact concerning the termination of parental rights are viewed under the manifest error/substantial credible evidence standard of review." *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (¶7) (Miss. 2007). Upon review, this Court must determine whether credible proof supports the county court's factual findings by clear and convincing evidence. *In re K.D.G. II*, 68 So. 3d 748, 751 (¶12) (Miss. Ct. App. 2011). However, "questions of law such as statutory construction are subject to de novo review, and if a [court] misapprehends the controlling rules of law or acts pursuant to a substantially erroneous view of the law, reversal is proper." *Chism v. Bright*, 152 So. 3d 318, 322 (¶12) (Miss. 2014).

## DISCUSSION

### I.     Statutory Prerequisites for Parental-Rights Termination

¶22. CSH contends the county court failed to apply the statutory prerequisites for parental-rights termination. Alternatively, she asserts that, even if the county court properly applied the prerequisites, it erred by finding the prerequisites were met by clear and convincing evidence. We address these two arguments together.

¶23. During the time relevant to this appeal, Mississippi Code Annotated sections 93-15-101 to -111 (Rev. 2013) governed termination-of-parental-rights proceedings. Section 93-15-103(1) established prerequisites for a court to consider before invoking any specific

statutory grounds for termination. *Chism*, 152 So. 3d at 322-23 (¶15).[3] Section 93-15-103(1)

provided:

> When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.

¶24. In recently discussing section 93-15-103(1), this Court adopted a "two[-]alternatives

interpretation" of the statute. *In re B.A.H.*, 225 So. 3d 1220, 1239-40 (¶63) (Miss. Ct. App.

2016). In so doing, we stated:

> [W]e should interpret [section 93-15-103(1)] as directing the youth court to consider whether there are grounds for termination of parental rights if ***either*** [1] the "child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child ***or*** [2a] the parent is unable or unwilling to care for the child, [2b] relatives are not appropriate or are unavailable, and [2c] adoption is in the best interest of the child."

*Id.* at 1238 (¶59) (quoting Miss. Code Ann. § 93-15-103(1)).

¶25. Upon review, we find the record contains substantial credible evidence from which

---

[3] After CSH filed her appeal, the Mississippi Legislature amended the statute so that the prerequisites are no longer applicable. *See* Miss. Code Ann. §§ 93-15-101 to -133 (Supp. 2016). However, the amended statute does not apply retroactively. Miss. Laws ch. 431, § 24 (H.B. 1240). We therefore apply the version of the statute in effect at the time CSH's parental rights were terminated. *See Mladinich v. Kohn*, 186 So. 2d 481, 483 (Miss. 1966) ("A statute will not be given retroactive effect unless it is manifest from the language that the legislature intended it to so operate.").

a rational trier of fact could conclude that, after Leo and Quinn's removal from CSH, DHS could not achieve reunification within a reasonable amount of time because doing so would be damaging to the children. *Id.* DHS took custody of ten-month-old Leo in May 2008 after CSH left him for several months with a non-relative who could no longer care for him. CSH admitted that she was using drugs at the time she abandoned Leo. The following month, in June 2008, DHS obtained custody of two-day-old Quinn after he tested positive for cocaine. The youth court found CSH had "neglected and/or abandoned" Leo and that she had neglected Quinn. In November 2008, after Leo and Quinn had been in DHS's custody for about six and five months, respectively, CSH began to schedule visits with her children.

¶26. The next year, in June 2009, the youth court reviewed Leo's case. The evidence showed that CSH continued to struggle with drug use, and by its August 5, 2009 order, the youth court found that CSH had failed to complete the terms of her service agreement. Despite these findings, the youth court granted CSH an additional six months to make progress on her service-agreement requirements.

¶27. Also on August 5, 2009, the youth court reviewed and entered an order in Quinn's case. As with Leo's case, the youth court found that CSH had failed to complete her service-agreement requirements to regain custody of Quinn. However, unlike with Leo's case, the youth court determined that termination of CSH's parental rights served Quinn's best interest.

¶28. Following an annual review of Leo's case in December 2009, the youth court also

12

ordered the termination of CSH's parental rights as to him.[4] In its subsequent related order, the youth court found that CSH's failure to complete her service-agreement requirements, coupled with Leo's age and amount of time in foster care, warranted the termination of CSH's parental rights. In May 2010, almost two years after losing custody of her children and entering into her service agreement with DHS, CSH completed a drug-rehabilitation program.

¶29.    We find that CSH's continued drug use between May 2008 (when Leo entered DHS custody) and January 2010 (when CSH entered the drug-rehabilitation program) presented an ongoing danger to her children that prevented DHS from returning them to her within a reasonable period of time. *See* Miss. Code Ann. § 93-15-103(1); *In re B.A.H.*, 225 So. 3d at 1241 (¶65). We further acknowledge that "state law *requires* DHS to file a [termination-of-parental-rights] petition for any neglected child who has been in foster care for fifteen of the prior twenty-two months." *In re B.A.H.*, 225 So. 3d at 1241 (¶65) (citing Miss. Code Ann. § 43-15-13(3) (Rev. 2015)). Although Quinn had only been in DHS custody for about a year when the youth court ordered the termination of CSH's parental rights as to him, Leo had been in DHS custody for more than fifteen consecutive months by the time of the youth court's order (effective December 2, 2009) terminating CSH's parental rights as to him.

¶30.    Upon review, we find the record shows the county court properly considered and applied the statutory prerequisites before determining whether to terminate CSH's parental

---

[4] Although the youth court waited until September 23, 2010, to enter the order terminating CSH's parental rights as to Leo, the youth court made the order effective from the date of the December 2, 2009 hearing.

rights. We likewise find sufficient record support for the county court's finding that clear and convincing evidence satisfied the statutory prerequisites for parental-rights termination. As a result, we find these assignments of error lack merit.

## II. Statutory Grounds for Parental-Rights Termination

¶31. CSH next challenges the county court's finding that clear and convincing evidence satisfied the statutory grounds for parental-rights termination. CSH contends the county court's termination of her parental rights was clearly erroneous in light of relevant Mississippi caselaw.

¶32. As previously discussed, the county court found by clear and convincing evidence that CSH's ongoing drug use prevented reunification with Leo and Quinn within a reasonable period of time after DHS removed them from her custody. *See* Miss. Code Ann. § 93-15-103(1). In continuing its analysis, the county court next found that clear and convincing evidence supported six different statutory grounds for the termination of CSH's parental rights.

¶33. Relevant to the statutory grounds upon which the county court based its decision, section 93-15-103(3) provides:

> Grounds for termination of parental rights shall be based on one or more of the following factors:
>
> . . . .
>
> (d)     When the child has been in the care and custody of a licensed child[-]caring agency or [DHS] for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:

14

(i) The parent has failed to exercise reasonable available visitation with the child; or

(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child[-]caring agency is unable to return the child to said parent; or

(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:

(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or

(ii) Because the parent fails to eliminate behavior, identified by the child[-]caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child[-]caring agency to assist the parent; or

(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or

. . . .

(h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the

15

child's parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest.

¶34. In another recent appeal involving the termination of parental rights, this Court explained:

> While section 93-15-103(1) provides that the grounds for [termination of parental rights] may be considered in combination, only one statutory ground is necessary to justify termination. Once the clear and convincing burden has been met, the best interest of the child is to be considered. Parental rights should be terminated only if the court determines that termination is in the child's best interest.

In re B.A.H., 225 So. 3d at 1241 (¶64) (internal citations and quotation marks omitted).

¶35. Upon review, we find the record contains credible evidence to support the county court's finding that at least one statutory ground existed for the termination of CSH's parental rights. Williams testified that DHS took custody of Leo after learning CSH had left him with a non-relative who could no longer care for him. No one knew CSH's whereabouts at the time, and CSH herself testified that she had suffered a relapse when she abandoned Leo. Testimony reflected that DHS soon took Quinn into custody as well because he was born with cocaine in his system. To be reunified with her sons, CSH signed a service agreement. With the aim of helping CSH become drug free, the service agreement required her to submit to random drug tests and to enroll in a drug-treatment program. However, for almost a year and a half after signing her June 2008 service agreement, CSH suffered relapses. According to CSH's own testimony, she did not truly become drug free until she entered a drug-treatment program in January 2010, which she subsequently completed in

16

May 2010.

¶36. Based on these facts, we find credible evidence supports the county court's findings as to the following three statutory grounds: First, CSH failed to comply with her service agreement, which prevented the children from being returned to her after more than a year in DHS custody. *See* Miss. Code Ann. § 93-15-103(3)(d)(ii). Second, CSH's ongoing drug use prevented reunification "[b]ecause [she] ha[d] a diagnosable condition unlikely to change within a reasonable time . . . , which [made her] unable to assume minimally, acceptable care of the child[ren.]" *See id.* § 93-15-103(3)(e)(i). Third, CSH's failure to eliminate the identified harmful behavior prevented reunification, despite DHS's diligent efforts to assist her. *See id.* § 93-15-103(3)(e)(ii).

¶37. We further find sufficient credible evidence in the record that, due largely to CSH's own actions, her mother-child relationship with Leo and Quinn substantially eroded. *See id.* § 93-15-103(3)(f). "A finding of substantial erosion of the parent/child relationship necessarily involves a consideration of the relationship as it existed when the termination proceedings were initiated." *In re K.D.G. II*, 68 So. 3d 748, 752-53 (¶22) (Miss. Ct. App. 2011) (citation omitted). At the time DHS initiated termination proceedings, Leo and Quinn had been in foster care for about three years. Following the boys' entry into DHS custody, CSH's own actions (her ongoing drug use) prevented her from regaining custody of the boys within a reasonable amount of time. Over time, these circumstances eroded the mother-child relationship. In fact, by the time CSH began to schedule and attend regular visits with the children, the undisputed testimony showed that Leo and Quinn had bonded with their foster

17

family and considered their foster parents to be their real parents. In contrast, multiple witnesses testified that no similar attachment existed between CSH and the boys. CSH herself even admitted that her relationship with Leo and Quinn had substantially eroded and that the children viewed the Smiths as their real parents. Accordingly, we find credible evidence supports the county court's finding on this issue.

¶38. Finally, the youth court, a court of competent jurisdiction, found that both children were neglected and/or abused and that reunification did not serve their best interests. *See* Miss. Code Ann. § 93-15-103(3)(h). As discussed, DHS took custody of Leo because CSH abandoned him with a friend, and the agency then obtained custody of Quinn after he was born with cocaine in his system. Multiple witnesses testified that Leo and Quinn were well adjusted in their foster placement, had formed strong attachments to their foster family, and considered their foster parents to be their real parents. Multiple witnesses also testified that reunification would not serve Leo's and Quinn's best interest because removing them from the care of their foster parents, who had raised the boys for most of their lives, would severely and negatively impact them. As a result, we find that sufficient credible proof established this statutory ground by clear and convincing evidence.[5] We further find sufficient proof supported the county court's finding that termination of CSH's parental rights served Leo's and Quinn's best interest.

## CONCLUSION

_____

[5] Because we find that at least one other statutory ground exists for the termination of CSH's parental rights, we need not address the county court's finding that CSH failed to exercise reasonable available visitation with Leo and Quinn under section 93-15-103(3)(d)(i).

¶39. We acknowledge that much of what the dissent raises in its arguments is factually correct. The unfortunate four-year delay in this case was largely attributable to the State's actions and has created prolonged uncertainty and unnecessary burden for CSH, the Smiths, and the minor children as they have awaited resolution. While we struggle with the outcome of this case, we find our caselaw and statutory law require the result reached. Even with the extended deadline granted by the county court, CSH failed to make progress on the terms of her service agreement within the time frame provided by the statute. As a result, we find substantial credible proof supported the county court's determination that clear and convincing evidence established all the statutory prerequisites and requirements for termination of CSH's parental rights and that the termination of her parental rights served Leo's and Quinn's best interests. We therefore affirm the county court's judgment.

¶40. **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J.**

**WESTBROOKS, J., DISSENTING:**

¶41. I respectfully dissent from the majority. At the hearing on March 9, 2015, in evaluating whether the statutory prerequisites for parental-rights termination were met, the county court and majority looked only at the behaviors of CSH during May 2008 through December 2009. After entering an inpatient drug-rehabilitation program in January 2010, CSH made substantial progress toward completing her service-agreement requirements. Additionally, CSH experienced many continuances for a hearing, most due to no fault or

19

request of her own. I believe those actions should have been taken into consideration at the 2015 hearing as well.

¶42. The United States Supreme Court, as well as the Supreme Court of Mississippi, has held a long standing tradition of protecting parental rights as fundamental rights. The United States Supreme Court held that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 745 (1982). Stating even further that, "[a] parental rights termination proceeding interferes with that fundamental liberty interest." *Id.* The Mississippi Supreme Court stated in similar fashion that "[b]ecause parental rights are so important, we sharply limit the circumstances under which can be terminated by the government." *Gunter v. Gray*, 876 So. 2d 315, 317 (¶3) (Miss. 2004).

¶43. The majority holds that the county court was proper in finding three statutory grounds for the termination supported by clear and convincing evidence. I disagree.

¶44. First, the majority states that CSH failed to comply with her service agreement, which prevented the children from being returned to her after more than a year in DHS custody, according to Mississippi Code Annotated section 93-15-103(3)(d)(ii) (Rev. 2013). While that is correct, CSH did complete her service agreement before the hearing. The children's social worker, Barbara Williams, testified in accordance with that fact, agreeing that from 2010 going forward CSH did everything to satisfy her agreement to get her children back, including going to treatment, finding housing, and having the financial means to provide for

20

the children.

¶45.    Second, the majority states that CSH's ongoing drug use prevented reunification. *See id*. § 93-15-103(3)(e)(i).  However, CSH completed her treatment at Born Free in Jackson, Mississippi in May 2010 and passed each subsequent drug test between then and the hearing, negating that her drug use was ongoing after treatment.

¶46.    Third, the majority states that CSH's failure to eliminate the identified harmful behavior prevented reunification. *See id*. § 93-15-103(3)(e)(ii).  However, as stated, CSH eliminated her drug use and made substantial strides toward completing the service-agreement before the hearing to ensure reunification.

¶47.    Additionally, the majority states that the mother-child relationship with Leo and Quinn had substantially eroded. *See id*. § 93-15-103(3)(f).  I agree.  Prior to 2015, the county court and DHS only provided CSH one hour a month with her children, totaling twelve hours a year.  Twelve hours a year is hardly enough time to build strong bonds, and erosion of the relationship would be a natural result.  However, CSH should not have been penalized, as the court and DHS aided in the erosion by not providing her more visitation.  Scott Colom, the guardian ad litem in the case, testified that ". . . of course you can have children regain bonds with parents but this is a unique situation in that they've already got bonds with parents and you expect them to be able to create new bonds with different parents, it's going to be hard, especially considering the circumstances."  Although difficult with additional time, the mother-child relationships among CSH, Leo, and Quinn could be mended.

¶48.    Furthermore, to address the other statutory grounds found by the county court: CSH

21

showed up for every visitation available to her. *See id.* § 93-15-103(3)(d)(i). Williams testified that CSH always took advantage of her visitations, even rescheduling when needed. Lastly, the county court should have re-evaluated CSH's behaviors after 2010 and the limitations placed on her by the court in her attempts to reunify with her children. *See id*. § 93-15-103(3)(h).

¶49. I find that when comprehensively looking at the entire period of time the children have been in DHS custody, the statutory grounds set forth by section 93-15-103(3) were not met. Therefore, CHS's parental rights should not have been terminated.

¶50. I respectfully dissent.

**IRVING, P.J., JOINS THIS OPINION.**