IRVING, J.,
 

 for the Court.
 

 ¶ 1. The Lowndes County Department of Human Services (LCDHS) filed a petition to terminate the parental rights of R.F.
 
 [1]
 
 in the County Court of Lowndes County, and the county court granted the petition. Aggrieved, R.F. appeals and asserts: (1) that the decision by the county court to terminate her parental rights was not supported by clear and convincing evidence, (2) that the county court erred in terminating her parental rights after having found that there did not exist a deep-seated antipathy by the minor child toward her, (3) that the county court erred in failing to consider alternatives to termination of parental rights, and (4) that the county court erred in finding that there was no requirement that the guardian ad litem meet with her.
 

 ¶ 2. Finding no reversible error, we affirm the judgment of the county court.
 

 FACTS
 

 ¶3. R.F.’s child, T.D.F., was born on July 3, 2001. On or about August 8, 2001, T.D.F. was placed in the care and custody of LCDHS due to failure to thrive and neglect. T.D.F. was then placed in the home of J.C. and G.C., and he has remained with them ever since.
 

 
 *1135
 
 ¶ 4. On September 7, 2007, LCDHS filed a petition to terminate R.F.’s parental rights. A hearing was held on the matter on December 13, 2007. During the hearing, Dr. Priscilla Roth-Wall, a clinical psychologist, testified that she had evaluated R.F. upon the request of LCDHS. She stated that R.F. has mild mental retardation and that she easily mistrusts others. Dr. Roth-Wall further stated that R.F. has difficulty with authority and has thoughts of retaliation and revenge. She opined that R.F. has a schizoid personality. According to Dr. Roth-Wall, R.F. is unable to care for a young child. Dr. Roth-Wall testified that she observed T.D.F. on several occasions and that he related well to J.C. and G.C. She concluded that termination of R.F.’s parental rights is in T.D.F.’s best interest.
 

 ¶ 5. Kessle Hughes, one of the initial social workers assigned to T.D.F.’s case, testified that the initial service agreement R.F. entered into on August 23, 2001, included such tasks as “parenting classes, drug testing, counseling, obtaining a job or source of income, housing, cooperating with social workers, visitation, [and] keeping contact or communication with the agency.” Hughes testified that R.F. did not comply with any of these tasks.
 

 ¶ 6. Debbie Sturgis, an LCDHS family protection specialist, testified that the LCDHS was ordered to proceed with the termination of R.F.’s parental rights in January 2004. She stated that after the LCDHS was ordered to proceed with the termination of parental rights, it no longer worked with R.F. because she “had been out of the picture for so long.” Sturgis stated that she was assigned to work T.D.F.’s case in February 2006, when T.D.F.’s biological father, T.C.T., was trying to intercede and obtain custody.
 
 [2]
 
 Sturgis testified that “after [T.C.T.] came back into the picture, I decided that I wanted to help [R.F.] get on Social Security disability because I thought that she was in need of it.” According to Sturgis, about six months after she began working with T.C.T., she received an order that “said something about doing a service agreement with [R.F.].” Sturgis stated that she informed R.F. numerous times that she needed to come into the LCDHS office and do a service agreement but that R.F. never came. Sturgis further stated that J.C. and G.C. were the only parents that T.D.F. knew.
 

 ¶ 7. Donna Reeves, the LCDHS area social work supervisor, testified as follows in regard to the observations she made about R.F.’s visits with T.D.F.:
 

 [T.D.F. has] been with [the LCDHS] for six years. [R.F. has] seen him 34, 35 times for an hour or less at each visit in that time period. She’s gone at least twice for over a year without seeing him at all. True, we were away from our office location, but we have offered her transportation. There just hasn’t been any opportunity to make a relationship with him, and I think the child has been resistant to it. He is better now than he’s ever been about visitation except maybe before he started walking after his infancy. And to be fair to her, she was good with him at these visits. She would speak softly to him. She would, you know, try to play with him. She would comfort him when he cried when he was an infant. He would scream so badly during those early visits that the people from economic assistance and child support would wander up the hall and ask could they help us, could they help us because he was screaming so desperately and loudly. He got better over time. And then she would disap
 
 *1136
 
 pear for long periods of time, and it was like starting over when she would come back. She was essentially a stranger to him each time she would be gone at least a year and then come back.
 

 Reeves further testified that she believed termination of R.F.’s parental rights was in T.D.F.’s best interest.
 

 ¶ 8. R.F. testified that as of the date of trial, she had a job and an apartment and that she was saving money to purchase a car and a house. She further testified that her employer would not allow her time off to visit with T.D.F. and that if she were absent too regularly, she would lose her job. When questioned about the two instances when she went for over a year without visiting T.D.F., R.F. stated that she had difficulty obtaining transportation to the LCDHS office.
 

 ¶ 9. In determining that termination of R.F.’s parental rights was in T.D.F.’s best interest, the county court stated in pertinent part:
 

 It is the court’s opinion that the primary concern in this court is the child. He is six years old. He has not been in your custody, [R.F.], since he was five weeks old. If the court removes him now, he will lose his mother. You have done phenomenally in the past 15 months. The court is amazed at what you’ve accomplished. And if this court could, the court would turn the clock back to 2001, but the court does not have that power. I can’t turn it back. It has been running. It’s run for six years. And certainly the statute speaks to deep-seated antipathy, but the court does not find that there is any deep-seated antipathy by your child against you. But what the court does find under [Mississippi Code Annotated section] 93-15-105 is that your child has been in the care and custody of a licensed child care facility for well over a year. He’s been there almost six years. That for the majority of those six years, [R.F.], you have struggled to get your life in order. And I know at 20 [years of age] versus 26 [years of age] there is a substantial difference, and you’ve made major accomplishments in the [past] 15 months, which would make you 24 [years old] to 26 [years old]. But the court cannot take a child that’s gone from five weeks to six years and pull him backwards to meet your accomplishments. It’s the old two steps forward and 15 steps backwards. The court cannot do that and does not think it’s reasonable and it thinks it would be devastating to your son. And accordingly, the court, realizing the effect it’s going to have on you, is going to terminate the parental rights.
 

 ¶ 10. Additional facts, as necessaiy, will be discussed during the analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Sufficiency of the Evidence
 

 ¶ 11. “The judgment of a county court in a nonjury trial is entitled to the same deference on appeal as a chancery-court decree, as to its findings of fact and conclusions of law.”
 
 Warren v. Derivaux,
 
 996 So.2d 729, 734(¶ 10) (Miss.2008) (citing
 
 Patel v. Telerent Leasing Corp.,
 
 574 So.2d 3, 6 (Miss.1990)). “[A] chancellor’s findings of fact concerning the termination of parental rights are viewed under the manifest error/substantial credible evidence standard of review. Therefore, we examine whether credible proof exists to support the chancellor’s finding[s] of fact by clear and convincing evidence.”
 
 W.A.S. v. A.L.G.,
 
 949 So.2d 31, 34(¶ 7) (Miss.2007) (citations omitted) (quoting
 
 K.D.F. v. J.L.H.,
 
 933 So.2d 971, 975(¶ 14) (Miss.2006)).
 

 
 *1137
 
 ¶ 12. R.F. asserts that the decision of the county court to terminate her parental rights is not supported by clear and convincing evidence. She argues that the LCDHS failed to make diligent efforts to implement service agreements for four years prior to the termination hearing. She further argues that her sporadic visitation with T.D.F. did not rise to the level of abandonment. She states that at the time of the trial, she had maintained employment for over a year and had developed a network of family and friends that would assist her in meeting T.D.F.’s needs. R.F. argues that our decision in
 
 N.E. v. L.H.,
 
 761 So.2d 956 (Miss.Ct.App.2000) required the county court in her case to focus on her current living situation. She asserts that her work schedule prohibited her from visiting with T.D.F. and that she could have lost her job if she was absent too regularly.
 

 ¶ 13. Mississippi Code Annotated section 93-15-103(3) (Rev.2004) lists various grounds for termination of parental rights. However, the county court relied on only two provisions of the section, which provide as follows:
 

 (3) Grounds for termination of parental rights shall be based on one or more of the following factors:
 

 * * * *
 

 (d) When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
 

 (i) The parent has failed to exercise reasonable available visitation with the child; or
 

 (ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
 

 (e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
 

 (i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
 

 (ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent[.]
 

 R.F. asserts that the county court judge should have relied on subsection (f), which reads as follows:
 

 When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment^]
 

 Miss.Code Ann. § 93—15—103(3)(f).
 

 ¶ 14. Although R.F. sets forth numerous assertions as to why clear and convincing evidence does not exist to support the county court’s decision, we are only concerned with the specific grounds that the county court determined necessitated termination. Accordingly, we find that clear
 
 *1138
 
 and convincing evidence exists to affirm the county court’s finding that R.F.’s parental rights should be terminated pursuant to Mississippi Code Annotated section 93 — 15—103(3) (d) (i) and section 93-15-103(3)(e)(i). As mentioned above, by the time of trial, T.D.F. had been in the custody of the LCDHS for six years, and R.F. had only visited with him for a total of approximately 34 hours. There wfere two periods where R.F. did not see T.D.F. for over a year. To put things in perspective, there are approximately 52,560 hours in six years. R.F.’s meager visitation with T.D.F. was unreasonable. Furthermore, Sturgis testified that she attempted several times to contact R.F. about coming to the LCDHS office to sign a service agreement, but R.F. failed to do so. A proper service agreement would have informed R.F. of what she should have done to maintain her parental rights. By not entering into a service agreement with the LCDHS, R.F. failed to learn how to act properly so that T.D.F. could be placed in her care. This issue is without merit.
 

 ¶ 15. As a part of her argument that the termination of her parental rights was not supported by clear and convincing evidence, R.F. asserts that the court erred in ordering the termination in light of its finding that T.D.F. did not possess a deep-seated antipathy toward her. R.F. argues that
 
 In re V.M.S.,
 
 938 So.2d 829, 834(¶ 10) (Miss.2006) stands for the proposition that when there is no deep-seated antipathy by the minor child toward the parent, termination of parental rights is not proper.
 

 ¶ 16. R.F.’s reliance on
 
 V.M.S.
 
 is misplaced. In
 
 V.M.S.,
 
 the decision to terminate the mother’s parental rights was based solely on Mississippi Code Annotated section 93-15-103(3)(f), which allows a court to terminate parental rights:
 

 When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, or prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment!)]
 

 The distinction between
 
 V.M.S.
 
 and the case at bar is the fact that R.F.’s parental rights were not terminated pursuant to section 93 — 15—103(3)(f). Rather, they were terminated pursuant to section 93-15-103(3)(d)(i) and section 93-15-103(3)(e)(i). Therefore, it was not necessary for the county court to have found that T.D.F. harbored a deep-seated antipathy toward R.F., as that is only one ground for termination. This issue is without merit.
 

 2. Alternatives to Termination
 

 ¶ 17. Next, R.F. contends that the county court erred in failing to consider alternatives to the termination of her parental rights and relies on Mississippi Code Annotated section 93-15-103(4), which states:
 

 Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of the parental rights,
 
 and these alternatives should he selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
 

 (Emphasis added).
 

 ¶ 18. As mentioned above, the county court’s “findings of fact concerning the termination of parental rights are viewed under the manifest error/substantial credible evidence standard of review.”
 
 W.A.S.,
 
 949 So.2d at 34(¶ 7). Credible evidence
 
 *1139
 
 exists to support the county court’s finding that termination of R.F.’s parental rights was in T.D.F.’s best interest. R.F. had seen T.D.F. for less than two days in six years. J.C. and G.C., who were arguably the only parents that T.D.F. knew, were ready and willing to adopt him. The guardian ad litem opined that termination of R.F.’s parental rights was in T.D.F.’s best interest. The county court found that its primary concern was T.D.F., and that it would be unreasonable and “devastating” to T.D.F. if R.F.’s parental rights were not terminated. Therefore, this issue is without merit.
 

 ¶ 19. Lastly, R.F. contends that the county court erred in finding that there was no requirement that the guardian ad litem meet with her. She argues that in
 
 M.J.S.H.S. v. Yalobusha County Department of Human Services,
 
 782 So.2d 737, 741(¶ 17) (Miss.2001), the Mississippi Supreme Court concluded that it may be appropriate for a guardian ad litem to meet with a natural mother. R.F. further argues that even though the guardian ad litem attempted to visit with her on three different occasions, “[a]ll the guardian would have had to do was leave a note or a card on the door or contacted [R.F.’s] counsel and [R.F.] would have known [the guardian ad litem] was trying to get in touch with her.” R.F. contends that, at a minimum, the guardian ad litem should have met with her, viewed her home, and inquired about her relationship with T.D.F. We find these arguments unpersuasive.
 

 3. Parental Contact with Guardian ad Litem
 

 ¶ 20. In
 
 M.J.S.H.S,
 
 782 So.2d at 741(¶ 18), the guardian ad litem failed to interview the minor children. In finding that the guardian ad litem failed in his duty to protect the best interest of the children, the court stated:
 

 While we are careful to allow the guardian ad litem as much flexibility as possible, we believe that in this case [the guardian ad litem] should have been prepared to testify as to the present health, education, estate and general welfare of the children. This of necessity would require that [the guardian ad litem] have interviewed the minor children, them current custodians, and prospective adoptive parents, if any. Additional record reviews, such as school grades and current medical ... or psychological records, in addition to the records already reviewed by [the guardian ad litem], would be helpful.... Since this is a termination of parental rights case, some contact with the natural mother
 
 may
 
 be appropriate.
 

 Id.
 
 at (¶ 17) (emphasis added). As emphasized above,
 
 M.J.S.H.S.
 
 does not
 
 require
 
 a guardian ad litem to contact or interview the natural mother; rather, it simply suggests that some contact
 
 may
 
 be appropriate.
 

 ¶ 21. Unlike the guardian ad litem in
 
 M.J.S.H.S.,
 
 the guardian ad litem in this case interviewed T.D.F. She also interviewed J.C., G.C., and the LCDHS social workers. The guardian ad litem testified that she went to R.F.’s home three times in an attempt to interview her. On one of those occasions, she waited approximately two hours for R.F. to return home. We find that pursuant to
 
 M.J.S.H.S.,
 
 the guardian ad litem was not required to interview R.F. Therefore, this issue is without merit.
 

 ¶ 22. THE JUDGMENT OF THE COUNTY COURT OF LOWNDES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 
 *1140
 
 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ, CONCUR.
 

 [1]
 

 . We use initials to protect the confidentiality of the parties.
 

 [2]
 

 . T.C.T. died shortly thereafter on May 14, 2006.