# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01739-COA

**C.P. AND L.W.**                                                                                      **APPELLANTS**

**v.**

**LOWNDES COUNTY DEPARTMENT OF CHILD**                      **APPELLEES**
**PROTECTION SERVICES AND ALEXIS, A**
**MINOR, BY AND THROUGH HER NEXT**
**FRIEND MARCUS D. DAVENPORT**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/10/2019 |
| TRIAL JUDGE: | HON. MILLS E. BARBEE |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| | CHAD KENNETH KING |
| ATTORNEY FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LINDSEY ETHERIDGE LAZINSKY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/25/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. C.P. (Joshua) and L.W. (Brittany) appeal from the judgment of the County Court of

Lowndes County, Youth Court Division, terminating their parental rights to their minor child,

Alexis.[1] On appeal, Joshua and Brittany argue (1) that the youth court erred by granting

termination pursuant to Mississippi Code Annotated section 93-15-117 (Rev. 2018); (2) that

the guardian ad litem's investigation and report was insufficient and thus did not provide an

---

[1] To protect the minor's identity and privacy, we use fictitious names for both her and
the Appellants.

independent finding as to the minor child's best interest; (3) that the youth court erred when it wholly failed to inform the parents of their rights at the beginning of the hearing; and (4) that the youth court erred by accepting the Lowndes County Department of Child Protection Service's proposed order verbatim without making any findings on the record. Because the record contains sufficient credible evidence to support the youth court's termination of both Joshua's and Brittany's parental rights, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Alexis was born in 2018 at the North Mississippi Medical Center in West Point, Mississippi. Shortly after Alexis's birth, the Lowndes County Department of Child Protection Services (CPS) received a call from the hospital that there were concerns regarding Brittany's ability to meet Alexis's basic needs and Brittany's mental limitations.[2] In April 2018, the Lowndes County Youth Court[3] entered an order placing Alexis in the custody of CPS.

*Youth Court Proceedings Prior To Termination*

¶3. On April 24, 2018, CPS filed a petition in the youth court alleging that Alexis was a neglected child pursuant to Mississippi Code Annotated section 43-21-105(*l*) (Supp. 2017).[4]

---

[2] Although Brittany's mental limitations and deficiencies will be discussed in greater detail below, we find it necessary to note here that later in the proceedings Brittany was found to be intellectually limited and had an IQ of 46. It was also determined that she had difficulty comprehending and expressing herself and was unable to read.

[3] In Lowndes County, the Youth Court is a division of the County Court.

[4] Section 43-21-105(*l*)(i) states that a "neglected child" means a child whose parent, guardian or custodian or any person responsible for his care or

An adjudication hearing was held on June 6, 2018, and the youth court's adjudication order was entered the same day. Pursuant to the order, Alexis was adjudicated as a neglected child as defined by Section 43-21-105(*l*)(i). The disposition hearing was continued to allow CPS to investigate the home of a maternal aunt to consider what, if any, licensure requirements would prevent the aunt from becoming a "relative" placement.[5] *See id*. § 43-21-105(ee). The temporary legal and physical custody of Alexis was placed with CPS, and weekly visitation between Alexis and her parents was ordered to continue as previously exercised.

¶4. On July 11, 2018, the youth court entered its "Disposition Order." The youth court held that placing Alexis in the home with her parents would be contrary to her welfare and that placement with CPS was in her best interest. The court further stated that "the circumstances were of such an emergency nature that no reasonable efforts [had] been made to maintain [Alexis] within [her] own home and there is no alternative to custody." The court thereby ordered that no reasonable efforts be made toward reunification of Alexis with her parents. The court also stated that aggravated circumstances existed, and CPS was ordered to proceed with the termination of Joshua's and Brittany's parental rights. The aggravated circumstances included both Joshua's and Brittany's intellectual and mental limitations and

support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter.

[5] The aunt's home was also a licensed resource home for Youth Villages.

3

the fact that Brittany's older child, Alexis's older sibling, had been in CPS custody for over one year, and the Lee County Youth Court had also ordered the termination of parental rights under the same circumstances.[6] Accordingly, Alexis was placed in a foster home in Lee County with her older sibling, and visitation between Alexis and her parents continued. The matter would be reviewed in one year.

¶5. After conducting a permanency hearing, the youth court entered a "Permanency Order" on August 21, 2018. The youth court found that after considering statements from Alexis's social worker, the guardian ad litem, and other relevant documentation, testimony, or recommendation pertaining to the cause, a permanency plan of adoption was appropriate and in the best interest of Alexis. The youth court also stated that the concurrent plan of custody with a relative was appropriate and ordered CPS to proceed with the termination-of-parental-rights proceedings.[7]

*Petition To Terminate Parental Rights*

¶6. On November 26, 2018, CPS filed a petition in the youth court to terminate Joshua's and Brittany's parental rights. In its petition, CPS stated that because Alexis had been in the custody and care of, or under the supervision of, CPS for a period of at least sixty days, it was not required to make reasonable efforts for the reunification of Alexis and her parents

---

[6] Although the youth court's disposition order stated that TPR proceedings had been scheduled for the older sibling, the record does not indicate whether the parents' parental rights had been terminated at the time of the TPR hearing for Alexis.

[7] The record does not contain any hearing transcripts for the proceedings discussed in paragraphs three through five; only the orders were included in the record.

4

pursuant to Mississippi Code Annotated section 93-15-117(b).[8] CPS further stated that reunification between the parties was not desirable toward obtaining a satisfactory permanency outcome based on aggravated circumstances, which was the basis for bypassing the reasonable efforts for the reunification of the parents and child under Mississippi Code Annotated section 43-21-603(7)(c),[9] or any ground listed in Mississippi Code Annotated section 93-15-119 (Rev. 2021) or section 93-15-121 (Rev. 2021). CPS also alleged that

---

[8] Section 93-15-117(b) lists one finding, among others, required to terminate parental rights when reunification efforts are not required, stating:

> That the child has been in the custody and care of, or under the supervision of, the Department of Child Protection Services for at least sixty (60) days and the Department of Child Protection Services is not required to make reasonable efforts for the reunification of the parent and the child pursuant to Section 43-21-603(7)(c) of the Mississippi Youth Court Law . . . .

[9] Section 43-21-603(7)(c) (Rev. 2021) states:

> Reasonable efforts to maintain the child within his home shall not be required if the court determines that:
>
>> (i) The parent has subjected the child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse and sexual abuse; or
>> (ii) The parent has been convicted of murder of another child of that parent, voluntary manslaughter of another child of that parent, aided or abetted, attempted, conspired or solicited to commit that murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury to the surviving child or another child of that parent; or
>> (iii) The parental rights of the parent to a sibling have been terminated involuntarily; and
>> (iv) That the effect of the continuation of the child's residence within his own home would be contrary to the welfare of the child and that placement of the child in foster care is in the best interests of the child.

5

Brittany and Joshua had engaged in conduct constituting abandonment or desertion of Alexis and were mentally, morally, or otherwise unfit to raise her, thereby constituting grounds for termination of their parental rights pursuant to Mississippi Code Annotated section 93-15-119(1)(a)(i).[10]

¶7. The petition further alleged both Brittany and Joshua had been medically diagnosed by a qualified medical health professional with a severe mental illness or deficiency that was unlikely to change in a reasonable period of time and that made the parents unable or unwilling to provide an adequate permanent home for Alexis. CPS stated that Brittany and Joshua were also unwilling to provide reasonably necessary food, clothing, shelter, or medical care for Alexis. According to CPS, Joshua's and Brittany's "abusive or neglectful conduct had caused, at least in part, an extreme and deep-seated antipathy by Alexis toward them, or some substantial erosion of the relationship between the parents and the child." Based on these assertions, CPS argued that it was in the best interest of Alexis that Joshua's and Brittany's parental rights be terminated so that a permanent and stable plan for Alexis's future could be made and so that she would be eligible for adoption.

---

[10] Section 93-15-119(1)(a)(i) states:

(1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:

(a)(i) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare.

6

*Guardian Ad Litem Report & Findings*

¶8.     Lisa Meggs was appointed by the youth court to serve as Alexis's guardian ad litem (GAL), and her GAL report was filed in the youth court on July 10, 2019. In her report, she recommended that Joshua's and Brittany's parental rights be terminated and that Alexis be placed in the care and custody of CPS. According to the report, the GAL based her recommendation and findings on (1) her review of a relevant court file; (2) her review of the youth court pleadings involving Alexis; (3) her interview of the social worker for the Lowndes County Department of Child Protection Services; (4) her review of the Mississippi Department of Child Protection Services case file involving Alexis; and (5) her review of the pertinent case and statutory law.

¶9.     Based on her interview with the social worker and her review of the aforementioned documents, the GAL found that the termination of Joshua's and Brittany's parental rights was appropriate because reunification between them and Alexis was not desirable toward obtaining a satisfactory permanency outcome based on aggravated circumstances as set out in Mississippi Code Annotated section 93-15-119 or section 93-15-121. The GAL also found that Joshua and Brittany were unwilling to provide reasonably necessary food, clothing, shelter, or medical care for Alexis. The report stated that their abusive or neglectful conduct had caused, at least in part, an extreme and deep-seated antipathy by Alexis toward Joshua and Brittany or some other substantial erosion of the relationship.[11]

*Trial On Petition To Terminate Parental Rights*

---

[11] The GAL did not testify at trial, but her report was marked and received into evidence.

¶10. The youth court held a trial on CPS's petition to terminate parental rights on July 10, 2019. Joshua and Brittany were represented by court-appointed counsel. Four witnesses were called to testify: Dr. Glenn Ellis, Sophia Kelly, Joshua, and Brittany. Dr. Ellis testified that he had performed a psychological evaluation on both Brittany and Joshua on May 18, 2018, and prepared reports reflecting his findings. The reports were entered into evidence.

¶11. Dr. Ellis testified that based on his evaluation, Brittany had an intellectual disability. According to Dr. Ellis, Brittany's full-scale IQ was 46, which meant she functioned on the behavioral level of an eleven-year-old. Dr. Ellis testified that he did not think Brittany was capable of providing an adequate home for a child. He based this assertion on two sources of information: his testing and Joshua's statement to him that Brittany could not be left alone with children. On cross-examination, Dr. Ellis stated that he had not seen anything indicating that Brittany was unwilling to care for her children. He further stated that there was no doubt that Brittany loved her children.[12]

¶12. When asked about Joshua's evaluation, Dr. Ellis stated that "[Joshua] came out borderline intelligence and personality testing." He further stated that there "was nothing in the results to warrant a diagnosis." Dr. Ellis stated that although Joshua had the minimum ability to care for small children, Dr. Ellis was not certain whether Joshua was capable of parenting. Dr. Ellis did state, however, that there was nothing found in his testing or in his

---

[12] Dr. Ellis's psychological report on Brittany stated that she was relatively passive, quiet, and cooperative. Dr. Ellis immediately noted that Brittany was intellectually limited. The report further stated that Dr. Ellis concurred with Joshua's statement that Brittany was incapable of caring for the minor children alone. Brittany had difficulty comprehending and expressing herself. During her evaluation, Brittany was presented with reading material but was incapable of reading it.

8

interview with Joshua that showed Joshua was incapable of parenting. Dr. Ellis stated that based on his assessment, Joshua would "like to do for the kids, but apparently did not always do so based on his history."[13]

¶13.    Sophia Kelly, the social worker assigned to the case, testified that Alexis was placed in CPS custody when she was just four days old after the agency had received a report of concern regarding Brittany's ability to meet the basic needs of Alexis due to Brittany's limited intellectual abilities. Kelly stated that there were concerns that Brittany was not even able to meet her own basic needs. After the case was opened, CPS developed a service plan with the family.[14] Kelly also stated that there were other concerns because the family had another child who already had been in CPS custody for a year.

¶14.    Kelly further stated that Alexis had been adjudicated as a neglected child, and the youth court's adjudication order was entered into evidence. According to Kelly, the youth court did not require CPS to make reasonable efforts to reunify the parents and Alexis because of aggravated circumstances that were cited. In addition, Kelly stated that "efforts had been made to work with the family towards reunification with [the] other child and no progress was made." Therefore, the permanency plan for Alexis was adoption. Kelly further testified that she thought Joshua and Brittany were unfit due to Brittany's intellectual

---

[13] In Joshua's psychological report, Dr. Ellis stated that "[Joshua] was found to be pleasant and cooperative, but he exhibited some strange, not menacing behaviors." During his evaluation, Joshua stated that the children could not be left alone with Brittany, and it was pointed out that it would be very difficult for him to constantly be with her. The report stated that Joshua had been "struck by an automobile while riding a bicycle on two occasions when he was a youngster."

[14] The details of the service plan were not included in the record.

disability.  According to Kelly, Brittany required daily supervision to be able to meet her own personal needs.  "She cannot drive.  She cannot cook.  She needs supervision in getting herself dressed."

¶15.   Brittany testified briefly at trial.  In pertinent part, the following was stated:

Q.   Do you think you can take care of your daughter by yourself?

A.   Yes, sir, I have been taking care of my nephew by myself.

Q.   But you've never taken care of [Alexis] have you?

A.   No sir, but I can.

Q.   Do you believe [Joshua] would help you?

A.   Yes, sir.

. . . .

Q.   You're willing to do whatever you can for your child, is that right?

A.   Yes, sir.

Q.   Anything else you want to tell the Court?

A.   I can take care of my kid.

¶16.   Kelly testified that Joshua belittled Brittany.  "He blames her for the children being out of the home or for them being in the situation."  She also stated that Joshua talked inappropriately in front of the children during the scheduled visits.  According to Kelly, Joshua constantly was "calling the workers out of their names" and threatening them in front of the children.  Kelly stated that Alexis's safety would be endangered if she were placed in the care of Brittany and Joshua.  Kelly said that there were several times that Joshua left

Brittany at home alone. Brittany would then contact Kelly, but Brittany asked that Kelly not report it because Joshua would get upset and blame her more. Kelly stated that "there was one time [Joshua] left her all day," and Brittany was cold and had not had anything to eat.

¶17. Kelly testified that the home Joshua and Brittany lived in was not suitable for an infant, and although they did have transportation, their transportation was not reliable. Their home was an older-model trailer, and according to Kelly, it did not meet CPS requirements. Kelly stated that during her first visit to the home, she observed mold, and the stove was not in working condition. She stated that she observed Joshua cooking on a hot plate, and the "light thing from the stove was hanging down." Joshua informed Kelly that the stove was not working. Kelly also stated that the floor down the hallway was not solid and needed to be replaced. There was no cool air or heat in the mobile home. Kelly stated that after her initial visit, she was not allowed to enter the home.

¶18. Although Kelly stated that she did not think that Joshua and Brittany were willing to provide reasonably necessary food, clothing, and shelter on a consistent basis for Alexis, she acknowledged that when Joshua and Brittany visited Alexis, they did bring a couple of outfits and hair products. "They make an effort to take care of the child." When asked what actions or statements Joshua had made that gave her the indication that he was unwilling or was not taking the situation seriously, Kelly testified about a phone call she received from Joshua on April 1, 2019. She stated that although Joshua understood from the beginning that housing was one of the concerns, he called her cell phone and joked about having a house.

> Well, he called the phone and my training buddy was with me. I was driving so she answered the phone and he said[,] hey[,] we got a new house, we got a

11

> new house. Anyway, when he called me when I was able to talk and he said I was trying to play a April's Fool joke on you and you let that cow answer the phone. He calls everybody animal names.

Kelly stated that Joshua did not understand the seriousness of or the importance of having suitable housing, reliable transportation, or the ability to meet the basic needs of his children on a consistent basis. Kelly also stated that Joshua liked to aggravate people. She testified that during one of the visits, Alexis had climbed up on a little slide at the park, and Joshua was making sounds that scared her. She stated that Joshua found humor in it and continued to do it although Alexis was crying. Kelly stated that Alexis began looking around for someone who would provide her safety.

¶19.   Kelly said she did not think there had been an erosion of the parent-child relationship, but she did not think Alexis understood that Brittany and Joshua were her mom and dad. According to Kelly, Alexis viewed her foster parents as her parents. Kelly also testified that Alexis was thriving in the foster home. Kelly stated that Alexis went to daycare on a daily basis and received early intervention services while at the daycare. Kelly also stated that she thought it was in the best interest of Alexis that Joshua's and Brittany's parental rights be terminated.

¶20.   Joshua testified that he and Brittany had been living together for three or four years. He stated that "the house that they lived in was not within living conditions." According to Joshua, they had been called by Moore Manor Housing and qualified for a three-bedroom home but were waiting on people to move out of the house. Joshua stated that Brittany qualified to get the house because she had children, but she had to have someone live there

12

with her to make sure the house was properly maintained. Joshua said that he was Brittany's caretaker. When asked why he had not been present when CPS visited the home, Joshua stated the following:

> Only thing she get into one of those moods, she'll make me mad and I got brain damage, I don't want to say anything or hurt her feelings so I might go down the road somewhere to cool off then I come back because if she gets mad with me she'll be just like I'm going to call child services on you. That's the first thing she'll say when she gets mad.

Joshua stated that "Dr. Goff," in Tupelo, had diagnosed him with brain damage.[15] "I take medicine for it but its not curable," Joshua said.[16] When questioned whether he intentionally agitated Alexis during his visits, Joshua stated that he was simply playing with her. Joshua testified that he has four other children whom he raised.[17] He stated that he was willing to do whatever was within his means to take care of Alexis.

¶21. Joshua testified that he and Brittany both received disability benefits ($771 each), which totaled a little over $1,500 a month. On cross-examination, Joshua stated that he paid their lot fee and cell phone bills and bought food with the money they received every month. He also stated that he owned two cars and bought things for the cars, such as tires and

---

[15] There were no medical records included in the record evidencing Joshua's brain injury.

[16] Joshua stated that the medicine calmed him down: "I take it at night so it keep me from like getting up in the middle of the night and acting silly and throwing stuff in the house. I take it at night." He further stated, "[i]t helped me but like I said I like to get on people's nerves. There's no cure for it, its just basically who I am."

[17] Joshua stated that he saw his eight-year-old daughter and nine-year-old son every weekend. He stated that he did not bring them to the house where he and Brittany lived. According to Joshua, he would pick up the kids and take them to McDonald's. He explained, "I spend time with them and I take them back home."

insurance, with their monthly income. When asked why he had two cars, Joshua said, "Because if one break down we won't have transportation. Where we stay at two cars are better than one. If something happened to one car and we need to go somewhere, emergency come up, we can jump in the other one." Joshua stated that he had about seven or eight hundred dollars in savings.

¶22. When asked what efforts he had made to secure suitable housing, Joshua stated:

> We check the other places like the ones they have a couple of them but its expensive know what I'm saying? He want like 500 deposit and 500 for rent, that's $1,000 right there before you even move in and then you got your lights and your water and your other utilities and other stuff so finally they called us at Moore Manor and within – it could be this week, it could be next week or before next month we got a house its going to be suitable. They're going to fix it. It's got air and heat and all of that. We just got to wait until someone turn their keys over, maybe by the first of next month we would be in it.

On cross-examination, Joshua said that he had just bought an air conditioner and a heater to go in their home but had not put them up yet. When questioned about Kelly's testimony that he had joked about having housing despite the severity of the situation, the following was stated:

Q: So it's a joke to you that you need to get a new home suitable for –

A: No, no, no.

Q: – your children?

A: No, it was playing a joke on her, April's Fool joke. I got her excited like I've got a house. I decided to play a joke on her. I wanted to get her really thinking that I had one and then when she said – I'd be like April Fool's. It was a joke to me.

. . . .

14

A.     It was a joke.  Everybody plays April Fool's jokes.

Q.     All right.  But do you not think that shows you don't take this seriously?

A.     No.

¶23.   After hearing the closing arguments of the parties, the youth court made a bench ruling.  The court stated that after taking into consideration all the facts in evidence, it was going to grant CPS's petition to terminate Joshua's and Brittany's parental rights.  Specifically, the court stated the following:

> The Court, in taking into consideration all facts in evidence that were presented to it, finds, by clear and convincing evidence, that the child has been adjudicated neglected, that the child has been in the custody and care of The Department of Child Protective Services of Lowndes County and the Court finds that the termination of parental rights is appropriate because of the reunification that was not reunification but it did not work and that the parents at this time shall not have custody and the petition for termination of parental rights is granted.

¶24.   The youth court entered its written judgment on July 10, 2019, recognizing the prior determination that adjudicated Alexis as an abused or neglected child.  The court found that because Alexis had been in the custody and care of CPS for a period of at least sixty days CPS was not required to make reasonable efforts for reunification between the parents and Alexis pursuant to section 43-21-603(7)(c).  The court stated that a permanency hearing had been conducted and that reunification between the parents and Alexis was not in the best interests of the minor.  In addition, the court found that termination was appropriate because reunification between the parents and Alexis was not desirable toward obtaining a satisfactory permanency outcome based on aggravated circumstances, which was the basis

15

for bypassing reasonable efforts for reunification under section 43-21-603(7)(c), or any ground listed in section 93-15-119 or section 93-15-121.

¶25. The court also listed several grounds supporting the termination of Joshua's and Brittany's parental rights. The court found that Joshua and Brittany had engaged in conduct constituting abandonment or desertion of Alexis or were mentally, morally, or otherwise unfit to raise Alexis. The court also stated that Brittany had been medically diagnosed by a qualified mental health professional with a severe mental illness or deficiency that is unlikely to change in a reasonable period of time, making Brittany unable or unwilling to provide an adequate permanent home for Alexis. The court found that Brittany and Joshua were unwilling to provide reasonably necessary food, clothing, shelter, or medical care for Alexis. Lastly, the court stated that the parents' abusive or neglectful conduct had caused, at least in part, an extreme and deep-seated antipathy by Alexis toward her parents or some other substantial erosion of the parent-child relationship. Based on these findings, the youth court determined that it was in the best interests of Alexis that Brittany's and Joshua's parental rights be terminated.

¶26. Joshua and Brittany now appeal, arguing the following issues: (1) that the youth court erred by granting termination pursuant to section 93-15-117; (2) that the GAL's investigation and report was insufficient and failed to provide an independent finding as to Alexis's best interest; (3) that the youth court erred when it wholly failed to comply with any of the provisions of Mississippi Code Annotated section 93-15-113(2) by not informing the parents of their rights at the beginning of the hearing; and (4) that the youth court erred when it

16

accepted CPS's proposed order verbatim without making any findings on the record.

## STANDARD OF REVIEW

¶27. "The county court's findings of fact concerning the termination of parental rights are viewed under the manifest error/substantial credible evidence standard of review." *C.S.H. v. Lowndes Cnty. Dep't of Hum. Servs.*, 246 So. 3d 908, 913 (¶21) (Miss. Ct. App. 2018). "Upon review, this Court must determine whether credible proof supports the county court's factual findings by clear and convincing evidence." *Id*. at 913-14 (¶21). Questions of law are subject to de novo review, "and if a chancellor misapprehends the controlling rules of law or acts pursuant to a substantially erroneous view of the law, reversal is proper." *Chism v. Bright*, 152 So. 3d 318, 322 (¶12) (Miss. 2014).

## DISCUSSION

¶28. "Parents have a fundamental liberty interest in the care, custody, and management of their child that cannot be taken away without clear and convincing evidence of the required statutory grounds for termination of parental rights." *Id*. at (¶13). The Mississippi Supreme Court has stated that "because parental rights are so important, the circumstances under which those rights can be terminated by the government are sharply limited." *Id*. at (¶14).

¶29. "The judgment of a county court in a nonjury trial is entitled to the same deference on appeal as a chancery-court decree, as to its findings of fact and conclusions of law." *R.F. v. Lowndes Cnty. Dep't of Hum. Servs.*, 17 So. 3d 1133, 1136 (¶11) (Miss. Ct. App. 2009). "Therefore, we examine whether credible proof exists to support the [county court's] findings of fact by clear and convincing evidence." *Id*.

**I.    Whether the youth court erred by granting termination pursuant to Mississippi Code Annotated section 93-15-117.**

¶30.   When reasonable efforts for reunification are not required, Mississippi Code Annotated section 93-15-117 authorizes a court to involuntarily terminate a parent's parental rights. Section 93-15-117 requires that the following factors be proved by clear and convincing evidence: (1) the child has been adjudicated abused or neglected, (2) the child has been in the custody of CPS for sixty days, with no requirement that CPS make reasonable efforts for the reunification of the parent and child pursuant to Mississippi Code Annotated section 43-21-603(7)(c), (3) that a permanency hearing or permanency review hearing was conducted, during which it was established that reunification with the abusive or neglectful parent is not in the best interest of the child, and (4) that termination is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome pursuant to section 43-21-603(7)(c) or any ground listed in section 93-15-119 or section 93-15-121.

¶31.   In its final judgment, the youth court found that Alexis had been adjudicated as abused or neglected on June 6, 2018. The court also found that Alexis had been in CPS custody since April 20, 2018, and CPS was not required to make reasonable efforts for reunification between the parents and Alexis. Next, the court found that a permanency hearing had been conducted and reunification between the parents and Alexis was not in the minor's best interest. The court also stated that termination was appropriate because reunification between the parents and Alexis was not desirable toward obtaining a satisfactory permanency outcome based on aggravated circumstances, which was the basis for bypassing reasonable

18

efforts for reunification under section 43-21-603(7)(c), or any ground listed in section 93-15-119 or section 93-15-121.

¶32. In addition, the court also found that Joshua and Brittany had engaged in conduct constituting abandonment or desertion of Alexis or were mentally, morally, or otherwise unfit to raise Alexis, constituting grounds for termination of their parental rights pursuant to section 93-15-119(1)(a)(i). The court stated that Brittany had been medically diagnosed by a qualified mental health professional with a several mental illness or deficiency that is unlikely to change in a reasonable period of time, making Brittany unable or unwilling to provide an adequate permanent home for Alexis, thus constituting grounds for termination of her parental rights pursuant to section 93-15-121(a). Pursuant to section 93-15-121(d), the court found that both Brittany and Joshua were unwilling to provide reasonably necessary food, clothing, shelter, or medical care for Alexis thereby constituting grounds for termination of their parental rights. The court also found that the parents' abusive or neglectful conduct had caused, at least in part, an extreme and deep-seated antipathy by Alexis toward her parents, or some other substantial erosion of the relationship between the parents and Alexis constituting grounds for termination pursuant to section 93-15-121(f). Based on these findings, the youth court determined that it was in the best interests of Alexis that Brittany's and Joshua's parental rights be terminated.

> A. *Whether reunification was desirable under section 43-21-603(7)(c).*

¶33. Joshua and Brittany argue that CPS failed to prove that reasonable efforts for reunification between them and Alexis was not required. However, the youth court

19

addressed this issue twice, first at the dispositional hearing, and again at the termination of rights hearing. At the end of both hearings, the youth court held that the proof established that reunification efforts were not required in this case.

¶34. Mississippi Code Annotated section 43-21-603(7)(c) states:

> (c) Reasonable efforts to maintain the child within his home shall not be required if the court determines that:
>
> > (i) The parent has subjected the child to aggravated circumstances, *including, but not limited to*, abandonment, torture, chronic abuse and sexual abuse; *or*
> >
> > (ii) The parent has been convicted of murder of another child of that parent, voluntary manslaughter of another child of that parent, aided or abetted, attempted, conspired or solicited to commit that murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury to the surviving child or another child of that parent; *or*
> >
> > (iii) The parental rights of the parent to a sibling have been terminated involuntarily; and
> >
> > (iv) That the effect of the continuation of the child's residence within his own home would be contrary to the welfare of the child and that placement of the child in foster care is in the best interests of the child.

(Emphasis added). In the July 11, 2018 disposition order, the youth court found that aggravated circumstances existed and no reasonable efforts would be required to maintain Alexis within her home. These aggravated circumstances included both Joshua's and Brittany's intellectual and mental limitations, and the fact that Alexis's older sibling had been in CPS custody for over one year and the Lee County Youth Court had ordered the termination of Joshua's and Brittany's parental rights to that child. The youth court's

20

disposition order held that Alexis's residence within Brittany's and Joshua's home would be contrary to her welfare and that the placement of Alexis with CPS was in the best interests of Alexis due to the court's finding of aggravated circumstances.

¶35. "The paramount concern in determining the proper disposition is the best interest of the child, not reunification of the family." *In re S.A.M.*, 826 So. 2d 1266, 1274 (¶19) (Miss. 2002) (citing *In re Beggiani*, 519 So. 2d 1208, 1213 (Miss. 1988)). In *G.Q.A. v. Harrison County Department of Human Services*, 771 So. 2d 331, 336 (¶21) (Miss. 2000), the Mississippi Supreme Court also emphasized that the polestar consideration in determining disposition is the best interest of the child. *Id*. In the disposition order in this case, the youth court specifically stated that "the circumstances are of such an emergency nature that no reasonable efforts have been made to maintain [Alexis] within [her] own home and there is no alternative to custody." Therefore the court ordered that "no reasonable efforts be made towards reunification of [Alexis] with [her] family."

¶36. Joshua and Brittany failed to designate the transcript of the disposition hearing for inclusion in the record on appeal. Accordingly, they cannot point to any evidence presented at that time that would show that the youth court erred in its findings in the disposition order. Therefore, we accept those rulings as conclusive and binding.

¶37. The youth court revisited the issue included in section 43-21-603(7)(c) at the termination of rights hearing and found for a second time that reunification was not desirable given the aggravating circumstances. Joshua and Brittany argue that the court erred in interpreting aggravated circumstances to include Brittany's and Joshua's intellectual and

21

mental limitations.[18]  We agree that intellectual disabilities cannot be grouped in the same category with extreme aggravated circumstances such as abandonment, torture, chronic abuse, or sexual abuse as listed in section 43-21-603(7)(c)(i).  However, the statute is not an exhaustive list of aggravated circumstances, hence the words "including, but not limited to." Although it cannot be grouped with that extreme category of aggravated circumstances, a *severe* intellectual disability such as Brittany's is still an aggravated circumstance nonetheless.  At trial, Brittany testified that she had just turned forty years old.  However, despite this, Dr. Ellis stated that Brittany functioned on the behavioral level of an eleven-year-old.  In addition, Kelly testified that Brittany was unable to meet her own basic needs, let alone the basic needs of a minor child.  Because of Brittany's severe intellectual disability, we hold that the youth court did not err in finding that placement within the parents' home would be contrary to the welfare and best interests of Alexis.  Moreover, given the aggravating circumstances and the other evidence in the record that placement of Alexis in the parents' home was contrary to the child's welfare, we hold that the youth court did not err in determining that reasonable efforts for reunification between Alexis and her parents under 43-21-603(7)(c) was not required.

> B.      *Whether termination of parental rights pursuant to section 93-15-119 and section 93-15-121 was appropriate.*

---

[18] The parents contend that the court erred in bypassing reunification pursuant to section 43-21-603(7)(c)(iii), which states that reasonable efforts are not required if the parental rights of the parent to a sibling have been terminated involuntarily.  The court was only required to determine whether subsections (i), (ii), *or* (iii) had occurred.  A finding of all three was not required.  Therefore, based on our finding that Brittany's severe intellectual disability constituted an aggravated circumstance, we decline to address this issue.

22

¶38. The youth court found clear and convincing evidence to support the termination of Joshua's and Brittany's parental rights pursuant to Mississippi Code Annotated section 93-15-119 and section 93-15-121. Specifically, the youth court determined that termination was proper under section 93-15-119(1)(a)(i) because the parents "engaged in conduct constituting abandonment or desertion of [Alexis], or are mentally, morally, or otherwise unfit to raise [her]." Under section 93-15-121(a), the court determined that Brittany had "been medically diagnosed by a qualified mental health professional with a severe mental illness or deficiency that is unlikely to change in a reasonable period of time and which makes [her] unable or unwilling to provide an adequate permanent home for [Alexis]." The court also found that Brittany and Joshua were "unwilling to provide reasonably necessary food, clothing, shelter, or medical care for [Alexis,]" thus constituting grounds for termination under section 93-15-121(d). Lastly, pursuant to section 93-15-121(f), the court determined that Joshua and Brittany's "abusive or neglectful conduct [had] caused, at least in part, an extreme and deep-seated antipathy by [Alexis] toward [her parents], or some other substantial erosion of the relationship between the parents and the child." Although only one statutory ground is required to justify a court's termination of parental rights, we find that there was credible evidence to support all grounds cited by the court in its final judgment. *R.B. v. Winston Cnty. Dep't of Child Prot. Servs.*, 291 So. 3d 1116, 1122 (¶17) (Miss. Ct. App. 2019) (citing *Barnes v. McGee*, 178 So. 3d 801, 805 (¶13) (Miss. Ct. App. 2013)).

### 1. Termination of the Mother's Parental Rights

¶39. We agree with the court's finding that Brittany's severe mental illness or deficiency made her unable to provide an adequate permanent home for Alexis. When she was just four

23

days old, Alexis was placed in CPS custody after CPS received a report regarding Brittany's ability to meet Alexis's basic needs. At trial, there was ample testimony presented to show that Brittany was unable to care for Alexis. As previously stated, Dr. Ellis testified that, based on his evaluation, Brittany functioned on the behavioral level of an eleven-year-old. Dr. Ellis also stated that he did not think that Brittany was capable of providing an adequate home for a child despite her willingness to care for her children. In addition, during his evaluation, Joshua told Dr. Ellis that Brittany could not be left alone with children. Joshua also attested to this at trial. Kelly testified that because Brittany was unable to meet her own basic needs, there was no way she could provide the basic needs of a minor child. Kelly stated that it was in the best interest of Alexis that Brittany's parental rights be terminated. Therefore, based on these facts, we find that there was substantial, credible evidence to support the youth court's termination of Brittany's parental rights pursuant to section 93-15-121(a).

### 2.    *Termination of the Father's Parental Rights*

¶40.    Pursuant to section 93-15-121(a) there was clear and convincing evidence presented showing that an established pattern of behavior made Joshua unable or unwilling to provide an adequate permanent home for Alexis.

¶41.    At trial, Kelly testified that Joshua talked inappropriately in front of the children during their scheduled visits. Joshua constantly used offensive names to refer to the CPS workers and also threatened the workers. Kelly stated that Alexis's safety would be endangered if she was placed in the care of Brittany and Joshua because there had been several times that Joshua had left Brittany at home alone despite the fact that he knew she

24

needed constant supervision. In addition, Kelly testified that Joshua did not understand the seriousness or the importance of having suitable housing and reliable transportation, nor did he have the ability to meet the basic needs of his children on a consistent basis. According to Kelly, Joshua liked to aggravate people and there had been instances during the scheduled visits where he intentionally sought to agitate or scare Alexis. Dr. Ellis also stated that based on his evaluation, Joshua would like to do for the children, but apparently did not always do so based on his history.

¶42. Based on these facts and testimony, we find that there was clear and convincing evidence to support the youth court's termination of Joshua's parental rights pursuant to section 93-15-121(a) because an established pattern of behavior made Joshua unable or unwilling to provide an adequate permanent home for Alexis.

## II. Whether the GAL's investigation and report were sufficient.

¶43. "A GAL's requirements are to be competent, without interests adverse to the child, and adequately informed as to her duties, as well as to act as a representative of the court and to assist the court in protecting the interests of an incompetent person by investigating and making recommendations to the court." *In re J.K.*, 304 So. 3d 184, 191 (¶22) (Miss. Ct. App. 2020).

¶44. Joshua and Brittany argue that the youth court erred by accepting the GAL's recommendation and report that demonstrated no independent investigation or contact with the family and Alexis. The parents assert that the GAL's report was simply a repeat of what was in the court file and relevant caselaw. They further argue that the GAL's investigation and report were insufficient because the GAL failed to speak with Alexis, the parents, foster

parents, or Alexis's older sibling. They also contend that the report is insufficient because the GAL failed to visit the homes of the parties involved and thus did not provide an independent finding as to the minor child's best interest.

¶45. In *In re J.K.*, this court examined the sufficiency of a GAL's investigation. In that case, a father appealed the termination of his parental rights arguing that the youth court erred in adopting the GAL's recommendation, which he claimed failed to show that the GAL made any independent investigation. *In re J.K.*, 304 So. 3d at 192 (¶23). At the end of the termination hearing, the youth court determined that the GAL was "experienced and qualified and did a thorough and competent investigation" and incorporated the GAL's findings into its judgment. *Id*. at 192 (¶26). On appeal, the father argued that the youth court erroneously relied on the GAL's report because there was no documentation by the GAL that she ever personally observed, interviewed, or even spoke to the child or the natural parents. *Id*. at (¶23). Our court held that "any alleged failure by the GAL to visit with [the father] or [the child] independently [did] not warrant either vacating the youth court's termination of [the father's] parental rights or a remand for further proceedings. *Id*. at 193 (¶28). Our holding was based on the fact that the GAL had participated in every youth court hearing and listened to testimony by the father, the mother, the foster mother, and the DHS social worker. *Id*. at 192 (¶26). "The GAL had also provided a thirteen-page report and recommendation, which included an extensive and detailed case history of the court hearings and all visits/communications between the child, natural parents, the DHS, and the foster parent, dating from April 17, 2015, to October 25, 2017." *Id*. In addition, in regard to the child's well-being, the GAL's report indicated specific knowledge of the child's development while

26

in DHS custody. *Id*. Therefore, we held that because the findings in the GAL's report were consistent with the evidence, any alleged failure by the GAL to visit with the father or child independently did not warrant vacating the termination of the father's parental rights or a remand of the matter for further proceedings. *Id*. at (¶28).

¶46. In this case, the GAL's report stated that her findings were based on: (1) a review of the pleadings in a relevant court; (2) a review of the youth court pleadings involving Alexis; (3) an interview of the social worker for the Lowndes County Department of Child Protection Services; (4) a review of the department of child protection services case file involving Alexis; and (5) a review of the pertinent case and statutory law. Although the GAL did not testify at trial, her report was entered into evidence, and the youth court relied on her recommendation in deciding whether to terminate the parents' parental rights.

¶47. There are no facts in the record evidencing that the GAL ever met with Alexis, her foster parents, her biological parents, or her older sibling. Although it is recommended that the GAL do so, this court has previously held that "while it may be appropriate for the GAL to contact or interview the natural parent, it is not required." *Id*. at 192 (¶24) (citing *R.F. v. Lowndes Cnty. Dep't of Hum. Services*, 17 So. 3d 1133, 1139 (¶20) (Miss. Ct. App. 2009)). In *In re J.K.*, the fact that the GAL failed to physically meet with the father and minor child was inconsequential based on the court's finding that she had attended all the hearings and had heard testimony from the parties. *In re J.K.*, 304 So. 3d at 192 (¶26). Here, there is nothing in the record evidencing that the GAL attended the hearings or heard any testimony from the parties before entering her report and recommendation. However, despite the fact that the GAL failed to do the optimal work that could have been done in this case, this error

27

did no harm because the youth court was presented with other sufficient evidence to support the termination of the parents' parental rights.

### III. Whether the youth court erred by failing to inform the parents of their rights at the beginning of the hearing.

¶48. Mississippi Code Annotated section 93-15-113(2)(a) (Rev. 2018) provides, in pertinent part, that at the beginning of an involuntary termination of parental rights hearing, "[t]he court shall also explain to the parent: (i) The right to counsel; (ii) The right to remain silent; (iii) The right to subpoena witnesses; (iv) The right to confront and cross-examine witnesses; and (v) The right to appeal, including the right to a transcript of the proceedings." Joshua and Brittany argue that the youth court failed to inform them of any of their rights at the beginning or at any point during the termination hearing. However, throughout the proceedings, the parents were represented by a court-appointed attorney. At trial, the attorney cross-examined CPS's witnesses and called the father to testify. After the father testified, the attorney informed the court that the mother also wished to testify. In essence, the parents here exercised the rights they claimed the court failed to give them. Therefore, we find that any error created by the court's failure to explicitly inform the parents of their rights caused no harm to the parents under these facts. However, we must note that under different circumstances, the failure to explicitly inform parties of their essential and fundamental rights, as required by Section 93-15-113(2)(a), could have harmful and prejudicial effects.

### IV. Whether the youth court erred by accepting CPS's proposed order verbatim without making any findings on the record.

¶49. Joshua and Brittany argue that the youth court failed to make any specific findings of

28

fact relative to the specific statutes pled before the court and such failure constituted an abuse of discretion. We disagree. In its written order, the youth court found that there was clear and convincing evidence to support the termination of the parents' parental rights pursuant to section 93-15-117. In addition, the court also found that termination was appropriate pursuant to section 93-15-119 and section 93-15-121.

¶50. Apparently, after the court's bench ruling, CPS prepared a proposed order that the court adopted after all attorneys had signed and approved. This practice is common and not prohibited. In one case, a mother made a similar argument that a chancellor's judgment was prepared by DHS and tracked DHS's petition to terminate parental rights. *J.C.N.F. v. Stone Cnty. Dep't of Hum. Servs.*, 996 So. 2d 762, 769 (¶23) (Miss. 2008). The language of the chancellor's judgment was essentially identical to the language in DHS's petition. *Id*. The Mississippi Supreme Court held that "whatever error the chancellor may have committed by signing the judgment as drafted by DHS is harmless because there is substantial, credible evidence supporting the termination of parental rights." *Id*. Likewise, we find that because there was substantial, credible evidence to support the termination of both Joshua's and Brittany's parental rights, any error committed by the youth court's failure to make specific findings of fact was harmless.

## CONCLUSION

¶51. Because the record contains sufficient credible evidence to support the youth court's judgment, we affirm the judgment terminating both Joshua's and Brittany's parental rights.

¶52. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, SMITH AND EMFINGER, JJ.,**

29

**CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND LAWRENCE, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**